278 P.2d 294

Emil J. JACOBSON et ux., Plaintiffs, Respondents, and Cross-Appellants,

v.

George W. SWAN et ux., Defendants, Appellants, and Respondents on Cross-Appeal.

No. 8050.

Supreme Court of Utah.

Dec. 17, 1954.

Plaintiffs Emil J. Jacobson and wife, respondents here, brought this action in unlawful detainer to recover about 1.20 acres of land with a home thereon in Orem, Utah. Plaintiffs sold this property to defendants, George W. Swan and wife, appellants here, under a uniform real estate contract, which after defendants' default was successively superseded by two other contracts. In each of these plaintiffs purported to lease such premises to defendants for a specified period and defendants agreed to pay a specified monthly rental, together with a specified amount stated to be due and unpaid under the original contract and all taxes, insurance premiums and other similar debts accruing during such period against such property. After defendants defaulted in their payments under the second lease agreement plaintiffs commenced this action upon defendants' failure to surrender the premises after notice to do so, claiming the right to possession and to retain all the payments made by defendants under all three of such contracts.

The trial court found that the stipulation as to liquidated damages amounted to a penalty which it would not enforce. Plaintiffs were awarded judgment for possession of the property and damages for holding over after notice to quit was served upon them. They were required to account to defendants for the sums paid under the original contract but not for the amounts

Ray H. Ivie, Allen B. Sorensen, Provo, for appellants.

J. Rulon Morgan, Dean W. Payne, Provo, for respondents.

WADE, Justice.

paid under the two subsequent lease agreements. Plaintiffs appeal, and defendants cross-appeal, each assigning as error parts of the judgment and rulings made adverse to them.

Prior to the sale to defendants a Mr. Nielson owned the property and listed it for sale with the Dixon Real Estate Company of Provo, Utah, for $14,000 with a down payment of $6,000 or more. Plaintiff, Emil Jacobson, a salesman for the company negotiated the sale to the defendants who could raise only $4,000 down payment so Jacobson advanced $10,000 and with it and the $4,000 down payment purchased the property receiving a conveyance to him and his wife on June 27, 1947, and on that day they sold it to defendants under the uniform real estate contract. This contract recited the $14,000 purchase price with the down payment of $4,000 and required monthly payments of $80 per month or more to be applied first to the payment of five per cent interest on all deferred payments and the balance to be applied on the payment of the principal until the purchase price was paid in full. The buyers agreed to pay all future taxes and insurance premiums and in case they were in default to pay the cost of enforcing the agreement including a reasonable attorney's fee. Buyers further agreed that in case they remained in default in making any payment for 30 days' after it became due the sellers at their' option would be released from all obligation to convey such property and forfeit all payments which had been made under such contract as liquidated damages and thereupon the buyers would became tenants at will of the sellers and that time was of the essence of the contract.

On March 11, 1949, defendants being in default in their payments, plaintiffs served them with an unconditional notice to quit the premises. After some negotiations, plaintiffs' attorney drew the first lease agreement dated ———— (sic) day of April, 1949, which was signed and became effective some time in that month. This agreement recited the making of the contract of sale, that a copy thereof was attached to and made a part of such agreement, that the defendants had defaulted in making their payments and were then "merely tenants at will," and that plaintiffs were willing that defendants remain in possession of such property "on a month to month basis for a period not to exceed one year from the date hereof, upon the terms and conditions herein set forth." It then provided that the "Lessors [plaintiffs] hereby lease to the Lessees [defendants] * * * for a period commencing May 1, 1949, and ending April 30, 1950," the premises in question and the defendants agreed to pay $100 per month on the first day of each month of such period, $80 of which "shall be rental and $20 shall be credited" to the payment of $889.41 the total sum then in arrears under the original contract, which defendants' agreed to pay on or before

April 30, 1950. Defendant also agreed to pay all insurance premiums and taxes assessed against such property during that period. This contract further provided that if defendants made all the payments in accordance therewith a new contract of sale would be entered into reciting the purchase price of $14,000 and giving credit for all payments made both on the original and substituted contracts. It stated "that the purpose of this contract is to allow the Lessees a reasonable opportunity to reinstate their right to purchase said property but at the same time to preserve the Lessor's right to remove the Lessees from possession as tenants at will in the event the latter do not perform according to the terms of this contract." Each party agreed in case of his default in performing the contract "to pay all costs and expenses that may arise from enforcing this agreement, * * * including a reasonable attorney's fee."

Upon special interrogatories a jury found that the Swans had paid a total of $1,440 during the year this lease was in effect and that on June 7, 1950, Swans paid $287.41 for taxes, insurance and attorneys' fees due under the lease. As stated before, they were required to pay, in addition to the $287.41, $80 per month as rent and $20 to apply on the arrearage plus the balance owing on the $889.41 or a total of $1,849.41. They were thus in arrears under this lease $409.41.

On June 27, a new lease agreement was entered into by which Jacobsons gave Swans another opportunity to make substantial payments over a three-year period, after which, if they so performed, the parties would revert to the original contract and give Swans credit for all payments they had made under all three contracts. Swans were to pay $300 on or before August 31, 1950, as rental, apparently from April 30 to that time. In case they failed to make that payment, defendants agreed to surrender the property to the plaintiffs on September 1, 1950, "and thereafter they will have no interest in or right to said property and that they will have no claim of any kind against the Lessees for any reason whatsoever." In case that payment was made the lease provided that "the Lessors hereby lease to the Lessees on a month to month basis for a period commencing with September 1, 1950, and ending May 31, 1953," and defendants agreed to pay $100 per month as rent on the first day of each month during that period and all insurance premiums, taxes, water rates, and gas and electric light charges against such premises during such period and each party agreed in case of his default "to pay all costs and expenses that may arise from enforcing this agreement * * * including an attorney's fee."

Defendants made the $300 payment and commenced on the three year term, making payments totalling $1,900, but on March 5,

1952, defendants being in default in their monthly payments, plaintiffs served them with an unconditional notice to surrender the premises on March 31, 1952. Immediately after this notice and until the suit was commenced on November 8, 1952, defendants tried to negotiate a settlement. They made a number of applications for a loan on the property, and stated a number of times that they were ready to pay the full balance of the purchase price, but apparently were unable to do so. They also tried to obtain co-signers to secure the future payments, but they failed to make arrangements which were satisfactory to plaintiffs who insisted that they were just stalling. Defendants made no further payments and plaintiffs served them with a similar notice on August 12, to surrender the premises on September 15, 1952.

The court refused to admit in evidence the testimony offered by defendant George Swan that several times after notice to quit was served he tendered payment of the full balance claimed to be owing, and that he had several times offered to refinance the deal and have responsible persons agree to make substantial payments each month.

The trial court concluded that the $5,060 paid under the original contract constituted a penalty and not liquidated damages. He allowed Jacobsons the reasonable rental value of $85 per month or $1,870, and held that the defendants were entitled to recover the difference of $3,190, but as against this credit to the Swans, he charged them with the amount due and payable under the second lease, including all unpaid rent, taxes, insurance premiums and water charges with interest thereon from the due date to the date of judgment, totalling $1,328.70. In addition to this the court gave the Jacobsons credit for $85 per month rent on the premises from September 15, 1952, to March 15, 1953, trebled for unlawful detainer, totalling $1,530, or a total set-off of $2,858.70, resulting in a net judgment in favor of defendants in the sum of $331.-30, plus interest at the legal rate from March 11, 1949. Costs were awarded to plaintiffs.

Each side argues many points which they assert have bearing upon their respective rights under the three agreements. We will consider four questions in the following order: 1. To what extent, if any, are defendants entitled to recover the payments made pursuant to these three contracts? 2. Should the court have awarded treble damages for unlawful detainer? 3. Was the defendants' proffered evidence which the court excluded admissible? and 4. Are plaintiffs entitled to attorneys fees?

To what extent, if any, are defendants entitled to recover the payments under the contracts? There are three separate documents in this case, each of which should be considered on its own merits: (a) The original contract of sale, (b) the first lease, and (c) the second lease.

As to (a), the original contract: We will not overturn the determination made by the trial court that the forfeiture of $5,060, after two years' occupancy would; under the circumstances, constitute a penalty and not liquidated damages, and hence was not enforceable. In this connection it should be pointed out that prior rulings of this court, including Perkins v. Spencer,[1] do not stand for the proposition that whenever payments made under a contract exceed the reasonable value of the use of the property by the purchaser, a provision that all payments which have been made will be forfeited as liquidated damages, will not be enforced. The parties have a right to so contract and such right should not be lightly interfered with. It is only when the forfeiture would be so grossly excessive as to be entirely disproportionate to any possible loss that might have been contemplated, so that to enforce it would shock the conscience, that a court of equity will refuse to enforce the provision. When the trial judge has made such determination, we will regard it as prima facie correct and will not disturb it unless it is plainly erroneous.[2]

In these long term vendor-purchaser cases the forfeiture provision allowing the seller to terminate the contract upon default in making the payments and to retain all payments as liquidated damages is a convenient means of inducing the purchaser to keep his payments up and a convenient means of collecting damages. It is now established in this state that where a forfeiture provision allows an unconscionable and exorbitant benefit to be retained by the seller which bears no relationship to the damages which have been sustained or reasonably could have been contemplated, it provides for a penalty or punitive damages which courts of equity will not enforce.[3] We appreciate the reluctance of courts to take money from a person who, though free from fault, has been injured by the default of the person who asks to be reimbursed contrary to the express agreement of the parties and on that account, as heretofore stated, such relief can be granted only where the facts clearly demonstrate that to enforce such an agreement would be unconscionable and would unjustly enrich the seller by allowing him to retain benefits greatly in excess of the damages he has suffered by reason of the other party's default.[4]

The trial court found that the payments made under the original contract before

---

1. Utah, 243 P.2d 446.

2. See Burton v. Lions Co-op. Mercantile Institution, Utah, 249 P.2d 514.

3. See Perkins v. Spencer, Utah, 243 P.2d 446; Malmberg v. Baugh, 62 Utah 331, 218 P. 975; Young v. Hansen, 117 Utah 591, 218 P.2d 666; also see Forfeitures Under Real Estate Installment Contracts in Utah, by Brigitte M. Bodenheimer, 3 Utah Law Review, 30 to 44; The Right of a Defaulting Vendee to Restitution of Installments Paid, by Arthur L. Corbin, 40 Yale Law Journal, 1013 to 1033.

4. See cases cited in note 3, supra.

the first lease was made were $3,190 more than the rental value of the property which was the actual damage caused by defendants' breach of that contract, since the property had not decreased in value and there were no other equities in plaintiffs' favor. Under their cross-appeal, plaintiffs contend that it was improper to require them to account for such amount (1) because they suffered damages under that contract which the court refused to consider and (2) because it was expressly agreed that in case defendants defaulted under the lease agreements they would surrender the property to plaintiffs and thereafter would have no claim against them of any kind or for any reason whatsoever.

Plaintiffs first claim that because they borrowed $5,000 of the $10,000 they furnished to purchase the property, and were repaying it by monthly installments including both principal and interest, which with the taxes and other expenses took a substantial portion of the rental value, their damages for breach of this contract was greater than the rental value of the property. There was no showing that they had to pay an unusually high rate of interest, or that the rental value would not pay interest on the full $14,000 purchase price of the property, only $10,000 of which plaintiffs furnished, and all the taxes and other expenses which they were subjected to and still leave them a net profit. Without such a showing the rental value of the property represented the damages which they suffered.

Their second contention is also not well taken. Where a contract for the sale of land is rescinded by mutual agreement with no express agreement as to the damages to the seller or the return of the purchase money paid, the purchaser is entitled to recover the money paid on the purchase price less the reasonable rental value of the property which he has occupied. Here we have either a mutual rescission of the contract of purchase, or plaintiffs terminated defendants' rights under the contract on account of their failure to live up to one or all of these agreements. Under either of those situations defendants are entitled to an accounting for this sum of money, for contrary to plaintiffs' contention there was no express agreement in either of the leases to the effect that defendants should not recover this money paid under the contract of sale. The provision on which plaintiffs rely to support their argument of an express agreement is contained in the second lease and deals only with the eventuality of defendants' failure to pay $300 before August 31, 1950, but defendants made that payment. There is no provision in the first lease which mentions defendants' right to recover this money, and no provision which deals with this right in case they defaulted in making the installments as they later did. So the trial court correctly required plaintiffs to account for this money found to be a penalty under (a), the contract of sale.

As to (b), the first lease: The parties were again free to contract as they desired. The lease provided that the Swans (purchasers) would pay $100 per month for a period of one year, $80 per month rent and specified that the extra $20 would apply on a delinquency of $889.41 on the original contract of sale, and that they would liquidate the entire delinquency within the year; and further that they would pay certain taxes, insurance and attorney's fees. The latter items were paid somewhat late, but only $480 of the $889.41 delinquency was paid. As to the amount paid on the delinquency, the lease contains no provision that such amount would be forfeited if the full payments were not made, so the Swans are entitled to an accounting for that fund. This is not true as to the payment of the taxes, insurance and attorney's fees. While a plausible argument can be made that these were payments on the original contract, they are more properly regarded as rental under the lease. The seller (Jacobsons) agreed to let Swans remain in the premises for $80 per month, plus the other items just mentioned. This is equivalent to an agreement on the part of Swans to pay as rent, both the $80 per month, plus such other items. The trial court did not find this contract to be unconscionable, and there is no basis upon which we can say, as a matter of law, that he erred in his conclusion. As to the first lease, then, plaintiffs were entitled to a credit of $480 which amount was paid on the delinquency existing on the original contract and all of which would be in excess of reasonable damages.

As to (c), the second lease: It should be viewed in the same general perspective as (b) just discussed. When the parties reached a new impasse, they were free to re-negotiate with respect to the property. They did so in a separate agreement. (Although it referred to the original purchase contract and contained a provision for another purchase on the same terms if certain conditions eventuated.) The Swans agreed to make a lump payment of $300 within three months, and if they did so, they were then to pay $100 per month for three years, which was referred to as rent, after which they could repurchase if they kept that agreement, and all payments made would be credited to them. They paid $1,900 under that agreement but were several months in arrears when their rights were finally terminated. The $100 per month rental was only $15 per month more than the jury found to be the reasonable rental value of the property. Again, the trial court did not regard the amounts required to be paid as unconscionable and there is no basis in evidence upon which we could say as a matter of law that his view was erroneous. The Swans are thus not entitled to have the $1,900 considered a credit to them in adjusting accounts with the plaintiffs, and the trial court properly ruled that the amount found to be owing by Jacobsons under this lease agreement should be allowed as a set-off in plaintiffs' favor against

the amounts owing defendant under the contract of sale and first lease agreement. The trial judge found that Swans were in default under the second lease for the following amounts: $950 for rent; $102.59 taxes for 1950; $106.53 taxes for 1951; $78 insurance premiums; and, $9.50 water assessments. Swans were therefore in default $1,246.62 under the terms of this second lease.

■ 2. Concerning the damages chargeable against Swans for holding over after the notice to surrender for a period of six months, from September, 1952, to March of 1953, it is our view that the Swans should be charged with the sum of $100 per month (or $600 total), the rental they had agreed to pay under the second lease and under which they were occupying the premises. Treble damages should not have been awarded due to the fact that the notice which was served upon the Swans was simply an unconditional notice to quit the premises with no alternative provided. Under our statutes lessees may be placed in unlawful detainer and subjected to the penalty of treble damages by that particular type of notice only in cases of a tenancy "for an indefinite time" or "in cases of tenancies at will".[5]

■ Under the second lease Swans, by payment of the $300, were in possession "* * * for a period commencing September 1, 1950, and ending May 31, 1953 * * *" and the parties agree that the leasehold could not be terminated except for default. Under such circumstances the Swans were tenants for a term (tenants for years).[6] The parties assume and the notice served in August acknowledges that at the time of service of such notice Swans were in possession under the second lease agreement. Nevertheless, the notice unconditionally declared that lease terminated, and while such a notice was sufficient to terminate the lease itself for breach of covenant, it was not sufficient to place Swans in unlawful detainer. The actual reason as recited by the notice, for termination of the lease was Swans' default. In such a case as this, the unlawful detainer statute requires an alternative notice that the tenant either perform or quit before he becomes in unlawful detainer and subject to treble damages.[7]

■ 3. With respect to the admissibility of defendants' proffered evidence of tender we affirm the ruling of the trial court that it was not admissible. Swans claim that evidence of tender was material both on the question of treble damages and on the question of wrongful termination of the contract by Jacobsons. As to the bearing of such evidence on treble damages, we have already stated that the unconditional

5. Sec. 78–36–3(2), Utah Code Ann.1953.

6. See American Law Institute Restatement of the Law of Property, Secs. 19, 20, 21 and accompanying illustrations. 1 American Law of Property 222, 223.

7. Sec. 78–36–3(3), Utah Code Ann.1953.

notice to quit was not sufficient to place Swans in unlawful detainer and hence whether they would have been able to perform had they been served with an alternative notice to either perform or quit is not material. It seems to us also that such evidence was not admissible for the purpose of showing a wrongful termination of the lease. Swans admit that they were in default under the terms of the lease and it is clear that in case of default Jacobsons were to have the right to terminate the agreement. Even if there had been a legal tender, which seems questionable in light of other evidence introduced, Jacobsons would not be compelled to accept such a late payment and thereby reinstate all of Swans' rights under the contract. Jacobsons had tolerated successive defaults under the first two agreements and it appears evident that when Swans defaulted on the third they felt it was time to insist upon their rights. We see no reason why they could not do so, and it is therefore immaterial whether there was an offer of performance by Swans, who were admittedly in default.

4. Plaintiffs are not entitled to recover attorney's fees. In Forrester v. Cook,[8] the contract provided the same as here that the purchaser agreed to pay all costs and expenses " 'which may arise from enforcing this agreement, including a reasonable attorney's fee.' " There we held that an action in unlawful detainer was to enforce a right given by statute and not to enforce the provisions of the contract. Under this decision the only part of this judgment in plaintiffs' favor is to award them possession of the property and damages for holding over. This case is governed by that decision.

In summary, we hold that under (a) the original contract of sale Swans are entitled to a credit of $3,190; that under (b) the first lease agreement Swans are entitled to be credited with the additional amount of $480 which was paid on the delinquency existing under the contract of sale and which added to the $5,060 paid on that contract would constitute an additional penalty; that under (c) the second lease agreement Jacobsons were entitled to a set-off in the sum of $1,246.62, the amount found by the court below to be owing under such agreement; and that plaintiffs are entitled to an additional set-off in the sum of $600 for the holding over of Swans after notice to quit had been served. Swans are thus entitled to a net judgment of $1,823.38.

Judgment reversed and case remanded with directions to enter judgment in accordance herewith. Defendants to recover their costs of appeal.

McDONOUGH, C. J., and CROCKETT, J., concur.

HENRIOD and WORTHEN, JJ., do not participate herein.

8. 77 Utah 137, 292 P. 206, 213.