304 P.2d 384

Donald H. TENNENT and Eleanor J. Tennent, husband and wife,
Appellants,

v.

Steve LEARY, dba Steve Leary Co.; James Kesicki and Wanda Kesicki, husband and wife, Appellees.

No. 6229.

Supreme Court of Arizona.

Dec. 13, 1956.

244

Arthur Goldbaum and Jo Ann D. Diamos, Tucson, for appellants.

John W. Ross and Paul J. Cella, Tucson, for appellees.

PHELPS, Justice.

This is an action to recover the sum of $1,500 earnest money paid to Leary by plaintiff Tennent in a real estate transaction wherein Tennent and his wife submitted to Leary, a real estate broker, a written offer to purchase a residence listed for sale with him by one James C. Kesicki. Both Kesicki and Leary were made party-defendants. The court entered judgment for defendants from which plaintiff appeals. The parties will be hereinafter designated by their last names.

The evidence does not disclose the sale price for which the property was listed with

Leary but the testimony of Kesicki justifies the inference that it was listed at $17,500. Tennent's offer, which was made in writing, was for the sum of $17,000, upon the condition that Kesicki, at his expense, would install a new 5,000 C.F.M. cooler with water pump and run a gas line ready for meter hook-up. This offer was executed on November 17, 1953 following a visit by Tennent and wife to the premises involved on November 15 or 16, at which Leary was holding an open-house for the purpose of contacting prospective purchasers.

Mrs. Cameron, a licensed real estate agent, working for Leary, met the Tennents while they were visiting the premises involved. On November 17, at about eleven o'clock at night, the Tennents executed the written offer here involved and delivered it to Leary, together with their check for $1,500 as earnest money.

On the next morning, November 18, Mrs. Cameron presented the offer to Mr. Kesicki for acceptance and he endorsed on the back thereof the following:

"November 18, 1954

"We agree to the sale of the above-described property at the above terms except for the following: We will install a new cooler of not less than 5000 C.F.M. and water cooler at purchasers' expense. Purchaser to pay for cooler at cost price to builder $170.00 approximately."

Thereafter on the same day Tennent was informed by a message sent to his home by Mrs. Cameron that his presence was desired at Leary's office concerning developments relative to his offer to purchase the Kesicki property.

He went to the office at 2:00 or 3:00 o'clock p. m. on the 18th. He was then informed by Mrs. Cameron that Mr. Kesicki had rejected his offer and had made a counteroffer as above set forth. After discussing the matter for a few minutes they then went into Leary's office, where, among other things, the following respective statements were made:

Mrs. Cameron testified that:

"Mr. Leary told Capt. Tennent that I (Mrs. Cameron) would go back as soon as Capt. Tennent—* * * I would go back to Mr. Kesicki and I would keep on working and trying to get the house for him since he wanted it, at his own terms, and that means including a cooler."

She stated that as Capt. Tennent was leaving the office he picked up all four copies of his written offer of purchase and,

"* * * said he would show all of the papers to the lawyer, and that he would get in touch with us in an hour."

"Yes, Mr. Leary said (to Tennent) it was all right for Capt. Tennent to take all of the copies of the offer, and I (Mrs. Cameron) said that if I were going to go back to Mr. Kesicki and get his signature I would need the original copy, So I took the original copy out of the batch and handed them back, handed the papers back to Capt. Tennent."

Mr. Leary told Capt. Tennent his lawyer would find nothing wrong with the papers;

"Q. Capt. Tennent heard you state that you were going back to see Mr. Kesicki, did he? A. Yes, he did.

"Q. He was present at the time?

A. He was present.

"Q. Did he object or tell you not to go back to Mr. Kesicki? A. He never said not to go back".

She also testified that he never told her to go back. In other words, he never said to go back to Kesicki and he never told her not to go back although he knew she was going to go back and try to persuade Kesicki to accept Tennent's original offer.

Mrs. Cameron further testified that:

"* * * Mr. Leary told him (Tennent) that he would wait for an hour for his call, and if there was nothing wrong, I could go back to Mr. Kes-icki and start working on the deal again, trying to get him the house."

And that as Tennent was about to leave-Leary got up:

"* * * and asked Capt. Tennent if he wanted his check back, if he wanted his money back."

She was then asked:

"Q. And what did Capt. Tennent say to that? A. Capt. Tennent said no, he didn't want the check back, he liked the property and wanted the property."

Both Leary and Capt. Tennent corroborat-ed this last statement.

Leary testified with respect to this last incident as follows:

"Q. As you approached the door and he was leaving, was anything in particular said regarding the check? A. The check we—at the time that I offered him that check back we stood up and were—and he was going out, and I said to him, 'Capt. Tennent, do you want your check back?' 'Oh, no,' he says, 'I want the property'. (Leary replied) 'Okay we will get it for you or try'".

When Tennent was asked if Leary had made these statements in his presence his answer was: "I don't remember him say-ing that".

Thus we have the positive testimony of both Leary and Cameron, plus the corroborative testimony of Mrs. Coutlee, an employee in Leary's office, who testified as follows:

"Well, just as Capt. Tennent was fixing to leave the office Mr. Leary asked him if he wanted his check back and he said, no."

When asked what else he said, she replied:

"He said he would let him (Leary) know in about an hour, he would call him back, and if he—and as he went out the door Mrs. Cameron said to him, 'well' she says, 'I will go back and see if I can't get this on the original deal and get the Kesickis to accept the original proposition'".

Mrs. Cameron testified she waited until "much later" before resubmitting the original offer to Kesicki and finally got his acceptance in writing.

The testimony concerning the school situation was that when Tennent informed Leary that Mrs. Tennent was unhappy about available transportation to the school, Leary then and there phoned the superintendent or proper official of the school and was informed that the authorities would route the bus one block closer to the premises. Mrs. Tennent was then sitting outside Leary's office in the Tennent car. Tennent, so far as the record discloses, made no suggestion that this was not satisfactory to him or that he would bring Mrs. Tennent inside the office to express her position in the matter. On the same occasion, at the request of Tennent, Leary procured the consent of the mortgagee to extend the mortgage against the home from fifteen years to a twenty-year period.

■ That Kesicki's counter-offer to Tennent's offer to purchase his property was in law a rejection of Tennent's offer, there can be no doubt. Hargrave v. Heard Inv. Co., 56 Ariz. 77, at page 80, 105 P.2d 520. It is not claimed by anyone that Tennent accepted the counter-offer. Therefore, unless Tennent by his actions and statements assented to the resubmission of his original offer to Kesicki, the judgment here must be reversed.

We are of the view, however, after a consideration of all of the above testimony, that the trial court was fully justified in rendering judgment for defendants upon the ground that Tennent (by his actions and by his statements to Leary and Cameron at Leary's office on November 18), assented to their resubmission of his original written offer of purchase to Kesicki.

Tennent's refusal to accept the check stating he didn't want it; that he wanted the property; that he liked the property; and his statement that he wanted to take the written offers to his attorney for him to look over them; Mr. Leary's statement that it was all right for him to do so; that

he would find nothing wrong with them; Tennent's statement that he would let them hear from him in an hour and being advised that unless they heard from him within an hour they would resubmit his original offer to Kesicki and seek to procure his acceptance, in the absence of a statement from Tennent directing them not to do so until further advice from him, we believe when considered together is clearly susceptible of the interpretation given it by the trial court.

■■ We must consider the evidence in the light most favorable to sustaining the judgment of the trial court. The incident relating to Tennent's starting to leave the office with the written offers for the purpose of taking them to his lawyer to look them over and the retention of the original in the office by Leary, upon which to procure Kesicki's signature, and Tennent's refusal to take back his check when offered by Leary stating he wanted the property and that he would get in touch with them within an hour, is admitted by Tennent. The testimony of Leary and Cameron that they would wait one hour to hear from him and would then cause Mrs. Cameron to resubmit the original written offer of purchase to Kesicki, was not denied. When asked if Mr. Leary told him Mrs. Cameron was going back to Kesicki with the offer Tennent replied, "I don't remember him saying that". We have held that this character of testimony is purely negative and

may not be construed as a denial. See: Stanley v. Moan, 71 Ariz. 359, 227 P.2d 389; Lasby v. Burgess, 88 Mont. 49, 289 P. 1028.

The testimony of Leary and Cameron that Tennent was informed the latter would resubmit his offer to Kesicki was corroborated by Mrs. Coutlee as above shown.

■ Counsel for appellant contends that the authorization of the agent to resubmit the offer had to be in writing under our Statute of Frauds and not having been in writing, there could have been no valid authorization. The only section of the Statute of Frauds which requires the authority of an agent to be in writing under the circumstances of this case is subsection 6, section 44–101, A.R.S.1956. That section requires such authorization to be in writing only where the authority is given by the party to be charged (the seller), which in this case, was Kesicki and has no application to the authority to submit an offer to purchase. See Shreeve v. Greer, 65 Ariz. 35, 173 P.2d 641.

■ We do not believe there is any merit to appellant's contention that Kesicki should have been required to offset the amount subsequently received from the property a few weeks thereafter when sold to another purchaser. The contract between Tennent and Kesicki provided that in the event the purchaser defaulted in his performance the earnest money should be

forfeited to Kesicki as liquidated damages, and it further provided that in the event of such default and forfeiture, Kesicki was to pay to Leary 50% of said earnest money, or $750, as commission, leaving for Kesicki the same amount.

We find the rule to be that although forfeitures are not favored in the law, if the agreement is that such forfeiture was intended as liquidated damages, such contract relating thereto, will be enforced unless the amount agreed to be forfeited would be so grossly excessive as to be entirely disproportionate to any possible loss that might have been contemplated, so that to enforce it would shock the conscience of the court. Armstrong v. Irwin, 26 Ariz. 1, at page 9, 221 P. 222, 32 A.L.R. 609; Jacobson v. Swan, 3 Utah 2d 59, 278 P.2d 294, 298; 15 Am.Jur., Damages, Sections 248, 249.

As above pointed out Kesicki was obligated to pay Leary $750 of the $1,500. He later sold the property for $500 less than Tennent offered to pay for it and he was unquestionably required to pay another commission for that sale. Hence, the forfeiture is not only not disproportionate to the loss sustained by Kesicki but does not fully compensate for his actual out of pocket expense.

Judgment affirmed.

WINDES and STRUCKMEYER, JJ., concur.

UDALL, Justice (dissenting).

I am firmly convinced the judgment of the trial court was erroneous and should be reversed. We have a peculiar situation presented by this record in that while the learned trial court gave no indication of the basis for entering judgment in favor of defendants, counsel for the latter predicate practically their whole argument in support thereof upon the proposition that the original offer of $17,000 by Tennent gave Kesicki an irrevocable option to accept same within two days, and gave Leary the same time in which to obtain Kesicki's acceptance thereof. Appellees' brief makes crystal clear their position:

"It is the stand of the appellees that anything done within the two days had no effect on Leary's right to bring about a binding contract, provided only, that he did so within the two day limit."

The majority saw the fallacy of this argument and flatly rejected such a contention. It properly held "that Kesicki's counteroffer to Tennent's offer to purchase his property was in law a rejection of Tennent's offer". Nevertheless, the judgment is upheld upon an entirely new theory—not briefed by either party—that Tennent had "assented to their resubmission of his original written offer of purchase to Kesicki", and that the latter having accepted the same there was a binding contract.

While not expressly so labeled it is implicit in the majority opinion that Tennent's silence, coupled with his conduct, constituted *estoppel* to deny resuscitation of his original offer to the vendor. The record indubitably shows that Tennent did not expressly sanction such resubmission by word of mouth, and there has never been any claim that a written authorization was given. Defendant Leary was questioned as follows:

"Q. Did he tell you to resubmit it? Answer yes or no. A. No.

"Q. Did he tell Mrs. Cameron to resubmit the offer? Yes or no, in your presence? A. No."

The saleslady, Mrs. Cameron, was interrogated about this matter also:

"Q. * * * Did Capt. Tennent ever authorize you to go back to see Mr. Kesicki after you first went there? A. By not stopping me when he knew that I was going."

Elsewhere the lady, in seeking to bolster her position, responded: *"In real estate a lot of things are done by implication"*—(emphasis supplied). This whole "rope of sand" as to the existence of a binding contract must necessarily rest upon the old maxim "Qui tacet, consentire videtur", i. e. "that silence gives consent". This is a species of evidence to be received with caution. 31 C.J.S., Evidence, § 296. I believe a principle unique in the annals of law is being enunciated, i. e. that an affirmative offer of a contract to buy realty can be made by mere silence. It is to be noted that no authority is cited by the majority in support thereof.

These salutary rules are laid down in 12 Am.Jur., Contracts, section 40, "Effect of Silence and Inaction * * *":

"It is a general rule of law that silence and inaction do not amount to an acceptance of an offer. * * * An agreement inferred from silence must rest on the principle of estoppel, and a change of position, in reliance on such silence, resulting in substantial injury is an essential element of the estoppel. It is said that circumstances which will impose a contractual obligation by mere silence are exceptional in their character and of rare occurrence; and no legal liability can arise out of the mere silence of the party sought to be affected, unless he is subject to a duty to reply which is neglected, to the harm of the other party."

If this be the law applicable to an offeree, it would seem a fortiori to apply in situations as here, involving the liability of an offeror.

The essential elements of estoppel are also set forth in the case of Weaver v. Martori, 69 Ariz. 45, 49, 208 P.2d 652. I submit, first, that Tennent never took a

position inconsistent with that asserted now. At all times he claimed that "* * when I left the office (Leary's) it was with the idea that everything would stay as it was until he heard from me", and it was not until the next day when he asked for a return of his earnest money check that he was told "* * * very definitely the deal was on and we had bought a house". Secondly, assuming that he had been inconsistent, this record does not show that either Leary or Kesicki were led to change their positions for the worse. Cf. Hughes v. John Hancock Mut. Life Ins. Co., 163 Misc. 31, 297 N.Y.S. 116, 120. In absence of such a showing this court cannot invoke estoppel, for the facts do not warrant its application.

It must be remembered that in real estate deals such as this the normal or usual relationship of principal and agent does not exist between the broker and the purchaser. Actually the broker Leary was a mere intermediary or middleman. See, Woods v. National Surety Co., 27 Ariz. 479, 233 P. 900. Yet, in the instant case, we find him joining with Kesicki to defeat Tennent's recovery of the $1500 paid as earnest money. The majority, as I see it, are basing their affirmance upon the testimony of Leary and his employees. It seems to me

that Leary should not be at liberty to make evidence for himself by the simple expedient of saying something to his opponent (Tennent) and then supporting the truth of his statement by proof that it was not denied. It is also my opinion that even assuming what Leary and his employees say is true, Tennent was under no legal duty to speak. I find in the record where Tennent was asked this direct question:

"Q. Did you hear Mr. Leary tell you or Mrs. Cameron tell you that Mrs. Cameron was going to resubmit the offer? A. No, sir, I didn't."

Certainly that is not negative testimony.

It is fundamental that to find a valid binding contract between Tennent and Kesicki there had to be a meeting of the minds; in other words, there must have been a distinct intention common to both offeror and offeree and that without doubt or difference. Such is not our case.

It is for the reasons above stated that I would reverse the judgment. The sharp practice on the part of the broker as shown by this record should not be rewarded.

LA PRADE, C. J. I agree with this dissent.