Clifton J. HACKFORD, Sharon Hackford, Randolph G. Hackford, and Sandra H. Asay, Plaintiffs and Appellants and Cross-Respondents,

v.

Albert Leo SNOW and Corwin Barton Snow, Defendants and Respondents and Cross-Appellants.

Albert Leo SNOW, Plaintiff and Respondent and Cross-Appellant,

v.

Randolph G. HACKFORD aka Randolph George Hackford, Clifton J. Hackford and Sharon Hackford, husband and wife; Clifton K. Hackford and Shirlene Hackford, husband and wife; and Sandra L. Asay, Defendants and Appellants and Cross-Respondents.

No. 17067.

Supreme Court of Utah.

Nov. 23, 1982.

Kathryn Collard, Salt Lake City, for Hackfords.

John C. Beaslin, Gayle F. McKeachnie, Clark B. Allred, Vernal, for Snows.

TIBBS, District Judge:

This matter involves two actions which were consolidated for trial. The Hackfords sued for unlawful detainer and the Snows sued for specific performance of an option to purchase included with a lease between the parties. The district court dismissed the unlawful detainer action and granted specific performance of the option. Both parties appeal. The Hackfords seek reversal of the judgment in its entirety while the Snows seek a remand with direction to enter judgment for treble damages and attorney fees. Because of the cross-appeals, the parties will be designated "appellants" (the Hackfords) and "respondents" (the Snows).

In April, 1975, appellants and respondents negotiated an agreement whereby respondents were to lease and have an option to purchase certain property owned by appellants and described in the agreement as: "Neola, (420 acre Hackford Farm), Uintah County, State of Utah." The agreement was drawn by a real estate agent on a standard earnest money receipt and offer to lease form. The agreement provided that appellants and respondents would execute "a written lease which will supercede and abrogate this agreement . . . within 10 days after tender of a firm lease prepared by the landlord in a form consistent with the above provisions and containing other customary and reasonable general provisions." The parties never executed a formal written lease.

At the time of the negotiation of the agreement, appellants were not certain that they would retain more than 445 acres of the farm as a result of other pending litigation. Appellants therefore decided to lease 420 acres of the 445 to respondents and to retain a 5 acre parcel surrounding the appellants' home and 20 acres of hay ground. The agreement contains no reference or description of the 25 acres of land retained by appellants which were not subject to the agreement. Appellants testified that they did not discuss or determine where they would retain the 20 acres of hay ground until sometime after the agreement was signed. At that time, they determined to reserve the 20 acres of hay ground in the southeast of the southwest section where an oil well was subsequently and is now located. Respondents, on the other hand, testified that at the time the offer to lease was signed, appellants walked over the property and pointed out that they would retain 20 acres contiguous to appellants' house.

Appellants testified that during 1975 and 1976, they and respondents entered into a verbal agreement whereby respondents were permitted to take hay from the 20 acres of appellants' hay ground not subject to the lease agreement, in exchange for

providing a certain amount of hay to appellants for their livestock. Respondents also allegedly agreed to pay the taxes and assessments on appellants' hay ground. Respondents acknowledged the existence of this verbal agreement with appellants but stated that they believed that the agreement related to land near appellants' home. Appellants testified that they did not see respondents on the farm after the fall of 1976, and that the parties had no verbal agreement with respect to respondents' use of hay from appellants' hay ground thereafter.

On January 25, 1977, appellants entered into an oil and gas lease with Flying Diamond Oil Corporation and an oil well was erected on what appellants now claim to be the 20 acres of hay ground not subject to the lease agreement. Respondents did not take any action to contest the construction of the well.

Pursuant to the "lease," respondents agreed to pay real property taxes and water assessments and to maintain the fences and water system on the property subject to the agreement. In 1975, the water assessment was paid a month late, only after appellants made several telephone calls to respondents. Although appellants made numerous requests and demands, respondents failed to pay the 1976 water assessment which remained due and delinquent as of February, 1977. At that time, appellants received a notice from the Uintah and Ouray Indian Agency, United States Department of the Interior, that they would receive no further water during 1977 until the assessment for 1976 was paid. Respondents thereafter paid the 1976 water assessment. Appellants were billed penalty charges and interest on the 1976 assessment which they were required to pay in order to obtain water for the 1977 season.

In 1976, appellants mended the fences on the property and telephoned respondents and reminded them of their obligation to maintain the fences on the property. Appellants also testified that respondents failed to pay the property taxes on the 420 acres, subject of the lease agreement, when the taxes fell due in November, 1976. Finally, the taxes were advertised as delinquent in a local newspaper.

Appellants testified that on or about April 17, 1977, respondents came to the farm to make the annual lease payment. Appellants informed respondents that the water assessment for 1977 had not been paid. Appellants said that they were going to terminate the agreement on April, 1975 for respondents' repeated breach of the agreement by failing to make timely payments of the property taxes and water assessment on the property. Respondents promised that they would perform their obligations under the agreement and pay the outstanding water assessments for 1977, together with the interest thereon, within three days. Appellants accepted the annual lease payment on the condition that respondents follow through on their representations.

Appellants testified that at the time they accepted the 1977 lease payment, respondents asked appellants to take a water turn on the leased property in May, 1977. When appellants went to the ditch to release the water in May, 1977, they were unable to take the water turn because the ditches had become filled with dirt and debris during the previous fall. The spring runoff in 1977 had washed over the ditch and created large gullies and washouts over a large area of appellants' property. After discovering the extensive erosion and damage to the property, appellants telephoned respondents and informed them that their failure to maintain the ditches had resulted in extreme damage to the property and that appellants were going to terminate the agreement of April, 1975. Respondents promised that they would have the ditches cleaned but did nothing in this regard. Finally, appellants cleaned the ditches themselves.

Respondents also failed to pay the 1977 water assessment as promised. In June,

1977, appellants were contacted by the Uintah and Ouray Irrigation Office and advised that unless water assessments were paid, appellants would not receive any water on their property after July 1, 1977. Appellants needed water for the hay on their 20 acres and a garden on the 5 acre parcel surrounding their house. They therefore paid the 1977 water assessment on June 30, 1977. Respondents admitted they never paid the 1977 water assessment despite their repeated promises to do so.

On July 7, 1977, appellants directed their attorney formally to notify respondents of the termination of the 1975 agreement. The attorney sent a letter to respondents so advising them on the same date.

On July 15, 1977, respondents and their attorney appeared at the home of appellants and attempted to deliver a check for the 1977 water assessment. The attorney also informed appellants that respondents were prepared to pay appellants the full purchase price, but did not attempt to tender payment. Appellants led respondents and the attorney through the field and indicated the extensive washouts and gullies that had been created as a result of respondents' failure to maintain the ditches, and further indicated that respondents' failure to pay the water assessments and taxes had created considerable hardship to the appellants. Considering that respondents had continued to breach the parties' agreement, appellants said they had terminated the lease and would accept no further payments from respondents.

Respondents continued in possession and removed hay from the property that summer. On September 27, 1977, appellants served respondents with a Notice of Termination of Lease Agreement and Notice of Eviction and Requirement to Vacate Premises within three days.

On October 17, 1977, respondents filed a complaint seeking specific performance of the lease and option provisions of the agreement of April, 1975. On February 6, 1978, appellants filed an action for unlawful detainer and other damages against respondents. On April 11, 1978, a pretrial conference was held for both actions. On that occasion, respondents filed a tender offer for the full purchase price of the property with the court.

Following a trial to the court, it was found as follows: (1) the earnest money agreement dated April 15, 1975, was a valid lease and option to purchase, binding on all parties; (2) the lease had not been terminated when the option was exercised by respondents; (3) the alleged breaches by respondents prior to exercising the option were not substantial. The court held that since the lease agreement had no terms for termination, it could only be terminated pursuant to provisions of the unlawful detainer statute. Since this was not done prior to respondents' exercise of their option, specific performance was granted.

Appellants contend that at the time the purported option was exercised, the lease had been terminated and that it was error for the court not to so find. The trial court found that respondents had not timely paid taxes and assessments, but that such were not substantial breaches of the lease as to justify forfeiture of the lease. Appellants challenge this factual finding as being an abuse of discretion. We generally defer to the prerogative of the finder of fact in such matters; nevertheless, we need not decide whether this finding is supported by the evidence in view of a more basic legal principle raised on appeal.

 In its memorandum decision, the trial court ruled as follows:

The letter of July 7, sent by [appellants'] counsel to [respondents] did not terminate the lease, and [the court] so holds. The Earnest Money Agreement contained no provisions for termination of the lease for violation of its terms and the proper procedure for termination was under the Forcible Entry and Detainer statutes of the State of Utah.

This ruling is in accordance with basic notions of landlord-tenant law.[1]

■ Generally, a lease may be unilaterally terminated prior to the expiration of its term by exercise of an option to terminate or by enforcement of a forfeiture. A forfeiture of the leasehold may result by virtue of a clause in the lease providing for forfeiture in case of breach of covenant or condition. Where such is clearly provided for, the courts will generally enforce it.[2] This was expressed in *Russell v. Park City Utah Corp.,* Utah, 548 P.2d 889 (1976), as follows:

> Parties are free to contract according to their desires in whatever terms they can agree upon and forfeiture is to be allowed where the terms of the agreement are clear.

■ In the absence, however, of an express forfeiture provision, the lessor's remedy is generally a claim for damages. This is true whether the breach is for nonpayment of rent, nonpayment of taxes, waste, etc.[3] In the instant case, appellants contend that the following language constitutes "an unequivocal forfeiture provision":

> In the event the tenant fails to execute said lease as herein provided, the amounts paid hereon shall, at the option of the landlord, be retained as liquidated and agreed damages, or landlord may elect to retain said sum and to require specific performance.

The foregoing merely provides that in the event the tenant failed to execute a future agreement, then any earnest money could be retained by the landlord as liquidated damages. There simply is no express provision whereby the lease could be terminated for breach of covenants.

■ A lease may also be terminated pursuant to statutory enactment, to wit, the Forcible Entry and Detainer Act.[4] In *Lambert v. Sine,* 123 Utah 145, 256 P.2d 241 (1953), where there was no written lease, the court held that the tenants at a motel "could only be dispossessed of the apartment by resort to the statutory remedy of unlawful detainer."[5]

In *Carstensen v. Hansen,* 107 Utah 234, 152 P.2d 954 (1944), this Court held as follows:

> The basis of a suit in unlawful detainer is unlawful possession, and a tenant ... is not holding unlawfully until he fails to comply with the demands of a notice which has been properly served on him.

1. What follows is a brief discussion of basic legal principles as explained in 49 Am.Jur.2d, Landlord and Tenant, §§ 990, 1020, *et seq.*

2. *Jacobson v. Swan,* 3 Utah 2d 59, 278 P.2d 294 (1954).

3. See, *e.g., Shoemaker v. Pioneer Investments,* 14 Utah 2d 250, 381 P.2d 735 (1963), and *Gerard v. Young,* 20 Utah 2d 30, 432 P.2d 343 (1967). Compare *Pingree v. Continental Group of Utah, Inc.,* Utah, 558 P.2d 1317 (1976), wherein it is stated that "this Court has consistently ruled a notice of forfeiture is sufficient to terminate a lease for breach of covenant, but it is not sufficient to place the lessee in unlawful detainer." Although not clear from the opinion, it must be assumed that the lease in Pingree contained a provision for forfeiture when covenants were breached.

4. U.C.A., 1953, 78–36–1, *et seq.*

5. The forcible entry and detainer statute provides a speedy and adequate remedy against a tenant who wrongfully is in possession of land. *Freeway Park Building v. Western States Wholesale,* 22 Utah 2d 266, 451 P.2d 778 (1968); *Paxton v. Fisher,* 86 Utah 408, 45 P.2d 903 (1935). However, it is not the exclusive remedy to oust one who is in wrongful possession. *Buchanan v. Crites,* 106 Utah 428, 150 P.2d 100 (1944). Generally, an action of ejectment will lie to recover the possession of leased premises where the tenant has retained possession after expiration of the term, or for nonpayment of rent or for forfeiture of the lease by breach of the conditions thereof, where it is stipulated in the lease that the lessor shall have the right to re-enter for such nonpayment of rent or breach of condition. 15 Am.Jur.2d Ejectment, § 52.

The notice provision of the Act must be strictly complied with.[6] The trial court correctly ruled that the letter of July 7 was insufficient to terminate the lease. Although the notice of September 27 complied with the requirements of the unlawful detainer statute, it was served after the exercise of the option on July 15.[7] The trial court was therefore correct in ruling that the option was exercised before the lease was terminated.

▮ Appellants also claim that the agreement of April, 1975 did not describe the subject property with sufficient certainty as to justify specific performance. Appellants further claim that the court erred in admitting extrinsic evidence to supply an otherwise inadequate description. They cite the case *Davison v. Robbins,* 30 Utah 2d 338, 517 P.2d 1026 (1973), for the proposition that the court should not have admitted parol evidence to help determine the location of the 20 acres retained by appellants. In *Davison,* the court refused to grant specific performance because the earnest money receipt was only an agreement to agree at some later date as to which property would be sold. In the instant case, the property was described as "Neola, (420 acre Hackford Farm), Uintah County, State of Utah." Although not precise, the description is sufficient to admit extrinsic evidence to aid in determining the parties' intentions, particularly in view of the trial court's finding of part performance.

In *Reed v. Alvey,* Utah, 610 P.2d 1374 (1980), the written agreement described the subject property as "corner of Hillview and Ninth East." In reversing the dismissal of plaintiffs' action for specific performance, we had this to say:

Before specific performance will be employed by the courts to enforce a contract the terms of the agreement must be reasonably certain so the parties know what is required of them, and definite enough

that the courts can delineate the intent of the contracting parties. In reviewing the written agreement evidencing the contract, and any ambiguity inherent in the language used, extrinsic evidence may be considered by the court to delineate the intent of the parties and the enforceability of the contract. Thus, courts are provided a means by which they can look beyond the terms found in the written agreement to ascertain the intent of the contracting parties. If from this examination of the transaction the courts determine the actual contract is certain and the obligation and rights of the parties defined, then they may employ their equitable powers to enforce the contract via specific performance. [Citations omitted.]

See also *Eliason v. Watts,* Utah, 615 P.2d 427 (1980).

▮ The intent of the parties in the instant case was ascertained through the doctrine of part performance. By their own conduct over a three-year period, the parties identified the 20 acres to be excluded from the agreement. Although contested, the evidence is sufficient to support the court's finding that the 20 acres retained by the appellants was the area adjacent to their house, which acreage included the horse pasture and other buildings built by appellants. On the facts presented, the extrinsic evidence was not admitted in violation of the statute of frauds.

Respondents claim that inasmuch as the court found in their favor, they are entitled to treble damages (pursuant to forcible entry) and attorney fees (pursuant to the earnest money agreement).

The trial court specifically found that appellants' actions did not constitute forcible entry. More importantly, however, the record discloses that respondents never served any type of notice on appellants, nor did their action sound in forcible entry. Even if the facts relied upon by respondents

---

6. *Van Zyverden v. Farrar,* 15 Utah 2d 367, 393 P.2d 468 (1964); *Perkins v. Spencer,* 121 Utah 468, 243 P.2d 446 (1952).

7. If liberally construed, the letter satisfies the tender requirement of U.C.A., 1953, 78–27–1.

would have justified a finding of forcible entry, the respondents failed procedurally to perfect their claim.

▮ The court ordered the parties to bear their own costs and attorney fees. Respondents appropriately point out that the earnest money agreement specifically provided that:

> If either party fails to [perform], he agrees to pay all expenses of enforcing this agreement or any right arising out of the breach thereof, including a reasonable attorney's fee.

The trial court found that appellants had failed to comply with the terms and conditions of the agreement. Respondents presented testimony as to the legal fees they had incurred in enforcing their rights under the agreement. The court erred in not awarding attorney fees to the prevailing party (*i.e.,* respondents). The case is therefore remanded and the trial court is directed to enter judgment in favor of respondents for attorney fees reasonably incurred at trial and on appeal.[8]

Reversed as to costs and attorney fees and affirmed in all other respects.

HALL, C.J., and STEWART and OAKS, JJ., concur.

DURHAM, J., does not participate herein.

HOWE, Justice (dissenting):

I dissent on the ground that the Earnest Money Receipt and Offer to Lease dated April 15, 1975 was insufficient in its description of the property to be leased and sold and thus did not comply with the statute of frauds.

A written agreement or memorandum which is relied upon to satisfy the statute of frauds must contain all the essential terms and provisions of the agreement of the parties. *Birdzell v. Utah Oil Refining Co.,* 121 Utah 412, 242 P.2d 578 (1952); *Baugh v. Logan City,* 27 Utah 2d 291, 495 P.2d 814 (1972). When applied to agreements for the sale or leasing of an interest in real estate, the rule requires a sufficient description of the real estate to be leased or sold. *Adams v. Manning,* 46 Utah 82, 148 P. 465 (1915). In that case the writing which was relied upon by the buyer for specific performance read:

> October 19, 1907. Received of H.W. Manning thirty dollars ($30.00) as part payment of 30 acres of land. Price to be $100.00 for said land. D.C. Adams.

46 Utah 2d at 83, 148 P. at 465. We held that to be an insufficient description to take the sale out of the statute of frauds. Similarly, in *Baugh v. Logan City,* supra, a reference in the minutes of the meeting of the Board of City Commissioners referring to certain property as the "City Property" was held to be an insufficient description to take an alleged oral exchange contract out of the statute of frauds. Again, in *Pitcher v. Lauritzen,* 18 Utah 2d 368, 423 P.2d 491 (1967), a description was held insufficient which merely stated "30 acres in North Logan as indicated by map." No map was shown the seller, who was the party sought to be charged, at the time the agreement was made.

On the other hand, we have held as not within the statute of frauds a contract provision which allowed the buyer to select the property from a larger tract owned by the sellers. *Calder v. Third Judicial District Court,* 2 Utah 2d 309, 273 P.2d 168 (1954). And in *Brady v. Faucett,* Utah, 546 P.2d 246 (1976), we upheld as sufficient a contract prepared by the vendor wherein he agreed to supply the description from documents at his disposal. These cases can be readily distinguished from those cited and discussed in the preceding paragraph of this opinion because the contract itself provided a definite means by which the location and description of the land could be determined without admitting parol evidence as to what each party intended.

A more difficult situation was presented in *Davison v. Robbins,* 30 Utah 2d 338, 340, 517 P.2d 1026, 1028 (1973), where the property was described:

> Property in question is briefly described in preliminary title report No. U–102434, Schedule A, issued Oct. 24, 1970 by Stanley and Sons, Inc. of Heber City, Utah, *less any acreage reserved by seller. Of-*

---

**8.** *Management Services Corporation v. Development Associates,* Utah, 617 P.2d 406 (1980).

fer contingent upon buyer's approval of net acreage description and grant deed executed and deposited in escrow.

The question there arose as to whether parol evidence was admissible to make certain the actual property the parties intended to sell and buy. In answering that question, this Court followed a well-recognized rule that "parol evidence is admissible to apply, not to supply, a description of lands in a contract." In denying specific performance we said:

> Parol evidence may be used for the purpose of identifying the description contained in the writing with its location upon the ground, but not for the purpose of ascertaining and locating the land about which the parties negotiated, and supplying a description thereof which they had omitted from the writing. There is a clear distinction between the admission of oral and extrinsic evidence for the purpose of identifying the land described and applying the description to the property and that of supplying and adding to a description insufficient and void on its face.

517 P.2d at 1029.

I believe the above to be a correct statement of the law. We first recognized this distinction between admitting parol evidence to simply locate on the ground the description contained in the writing and admitting it for the purpose of adding to a description incomplete on its face in 1915 in *Adams v. Manning,* supra. There we held that parol evidence was admissible to identify the property mentioned in the agreement or memorandum when it is referred to simply as a house and lot on a certain street, or a certain farm or property by its usual name. See *Eliason v. Watts,* Utah, 615 P.2d 427 (1980); *Nielsen v. Rucker,* 8 Utah 2d 302, 333 P.2d 1067 (1959); and *Easton v. Thatcher,* 7 Utah 99, 25 P. 728 (1891) as examples of the application of this rule.

In the instant case, the property was described in the writing as "real property and/or fixtures and equipment situated at Neola, (420 acre Hackford farm) Uintah County, State of Utah." Had the Hackford farm consisted only of 420 acres, it would have been entirely permissible to allow parol evidence to identify the bounds of the subject property. The difficulty, however, is that the Hackford farm consists of 445 acres and the parties were in sharp dispute as to the location of 20 of the 25 acres to be excluded from the sale and reserved by the sellers. Under the rule that parol evidence is admissible to apply, not to supply a description, admission of parol evidence to fix the 20 acres was erroneous because the writing did not specify which 20 acres was to be excluded nor give a key by which it could be determined. In this respect, this case is identical to *Pitcher v. Lauritzen,* supra, and *Davison v. Robbins,* supra, where the writing did not designate which acreage should be reserved by the seller. The majority opinion attempts to distinguish *Davison v. Robbins* on a different ground, i.e., that the writing there was only an agreement to agree in the future what exact property would be sold. That ground was only one of two grounds relied upon by this Court. The other ground was that parol evidence is not admissible for the purpose of determining what property the parties agreed to buy and sell. That is exactly what the trial court did here since it took parol evidence to determine which 25 acres the parties intended to exclude when the writing did not so specify and gave no key for ascertaining. The writing was an Earnest Money Receipt and Offer to Purchase which by its very terms was intended to be only a temporary binder until a permanent lease could be drawn. It is therefore understandable that the Earnest Money did not contain an adequate description.

The trial court justified admission of the parol evidence as showing part performance and noted that "the occupancy and farming of the acreage by the plaintiffs and the receipt of all lease monies by the defendants for three years of the lease, which lease monies defendants made no attempt to return, memorialized the description of the 420 (acres) ...." The practice of referring to claimed part performance to aid in the proof of the terms of a contract was cautioned against by this Court in *Adams v. Manning,* 46 Utah at 86, 148 P. at 466,

where we quoted with approval the following statements from Roberts on Frauds, 135:

> To call anything a part performance, before the existence of the thing (the contract) whereof it is said to be part performance is established, is an anticipation of proof by assumption, and gets rid of the statute by jumping over it, for the statute requires proof, and prescribes the medium of proof.

We further stated that if possession by the buyer is relied upon as part performance, it should be established without qualification or doubt. In the instant case there was considerable dispute as to the identity of the exact land possessed by the buyers. Evidence was presented that the sellers had occupied the 20 acres adjacent to the home and built improvements on it, yet at other times had fenced and occupied the 20 acres where the oil well was located. The buyers, who claim that the 20 acres reserved by the sellers was near the home, readily admit that they cut the hay from this ground, and that they made no objection when the sellers allowed oil drilling equipment upon the 20 acres down in the field. This being a case at equity where we are permitted to review the facts as well as the law, I am compelled to conclude that the parol evidence offered to prove the identity of the 420 acres possessed by the buyers was anything but clear and definite. I would deny the buyers specific performance.

I concede that the recent decision of *Reed v. Alvey*, Utah, 610 P.2d 1374 (1980) contains broad language (quoted in the majority opinion) which seemingly might authorize the admission of parol testimony in the instant case. That case, however, did not purport to overrule any prior decision of this Court and I would limit the broad language to the facts of that case, viz., there was no real dispute as to what property the parties intended to sell or buy since the seller had sold to others all his property at that address except the unit claimed by the plaintiff buyer.

I am in accord with an observation made by Justice Frick in *Adams v. Manning*, 46 Utah at 86, 148 P. at 466, where he said:

> It has, however, always seemed to the writer that unless the courts are very careful in the admission of parol evidence and in acting upon the mere inherent probabilities as such appear to the courts they will, in equity, enforce parol contracts which are clearly within the statute as readily as courts of law enforce all other contracts and we thus entirely fritter away the statute of frauds.

See the dissenting opinion of Justice Wilkins in *Stauffer v. Call*, Utah, 589 P.2d 1219 (1979). I can only add that what the trial court did here flies in the face of the purpose of the statute of frauds. If the statute served no purpose, then the Legislature should repeal it, but this Court should not make inroads upon it to achieve our sense of justice in a given case.