BEKINS BAR V RANCH, a Utah corporation, James F. Fain and Emma A. Fain, Plaintiffs, Respondents and Cross-Appellants,

v.

C. Stanley HUTH and Helen I. Huth, his wife, and Security Title Company of Southern Utah, Defendants, Appellants and Cross-Respondents.

No. 17746.

Supreme Court of Utah.

April 15, 1983.

---

Michael D. Hughes, St. George, for defendants, appellants and cross-respondents.

J. MacArthur Wright, John L. Miles, St. George, for plaintiffs, respondents and cross-appellants.

STEWART, Justice:

The principal issue on this appeal is whether finance charges that defendants Huths charged on two loans to plaintiff Bekins Bar V Ranch are unconscionable and therefore unenforceable. The trial court ruled that the finance charges were unconscionable and substantially reformed the parties' written loan agreements to reduce the amount that Bekins Ranch owed the Huths. We reverse the ruling that the finance charges were unconscionable and hold that the loan agreements should be enforced as written.

## I.

In early 1977 Bekins Bar V Ranch, a Utah corporation, was struggling to extricate itself from a Chapter 11 bankruptcy proceeding and needed capital to help work its way out. To obtain the funds to refinance the ranch, James Fain, Bekins' president, negotiated a $1.1 million loan from Mutual of New York (Mutual). Fain subsequently discovered that in order to close the loan with Mutual he would need an additional $120,000. Fain initially sought loans from local banks in the southern Utah area which turned him down. Fain then visited Stanley Huth, a California real estate broker, and several investor friends of Huth from whom Fain had previously obtained loans. After some negotiation, Fain's business partners backed out because part of the security offered by Bekins had been previously pledged. Huth and his wife, however, loaned $120,000 to Bekins. In return Fain and his wife signed a $200,000 note payable to Huth and his wife on March 8, 1977. The $200,000 was to be repaid in annual installments over three years, $100,000 at the end of the first year and $50,000 at the end of the second and third years, with no additional interest on the outstanding balance (apart from the $80,000 finance charge) except for a 10 percent charge on late payments. Bekins' trustee in bankruptcy approved the transaction. The parties agreed that the premium paid by Bekins, treated as interest, would be the equivalent of an effective annual interest rate on the loan of 36.3 percent. The loan was secured by a second trust deed on the ranch real property (placing Huths in second position behind Mutual), a bill of sale and buy-back agreement giving Huths a security interest in the farm equipment, three years of hay crops, and other personal property.

Two months later, Bekins Ranch found itself in need of additional operating funds to complete production of the 1977 hay crop. Fain again contacted Huth and requested another $80,000, which Huth agreed to loan in order to protect his security interest in the hay crop. On May 17, 1977, Fain and his wife signed a $100,000 promissory note payable to Huth and his wife. Under the second agreement, Huth advanced $80,000 cash to Fain; the remaining $20,000 constituted a finance charge. The $100,000 was due some six months later on December 31, 1977. Interest at the rate of 10 percent was to be paid on any delinquent amounts. Treating the finance charge as interest, the rate of interest on the second note amounted to 58 percent per annum. This loan was secured by a third trust deed on the ranch real property and was to be repaid from the proceeds of the 1977 hay crop. Subsequently, Huths made other short-term loans to Bekins to help cover operating costs. Those loans were all repaid without incident.

By March 8, 1978, when the first $100,000 installment on Bekins' $200,000 note fell due, Bekins had not sold its harvested 1977 hay crop and the installment was not paid when due. Bekins was also at that time delinquent on the second note of $100,000 to Huths which was due December 31, 1977. In addition, Bekins was delinquent on the first installment of $190,000 owed to Mutual on the $1.1 million loan. That installment was due on January 1, 1978.

To help Bekins and to obtain some repayment of funds the Huths had loaned, Huths on April 19, 1978, agreed to buy Bekins' entire 1977 hay crop. At that time, the second note for $100,000 had been due and unpaid since December 31, 1977, and the first $100,000 installment on the first note

of $200,000 had been due and unpaid since March 8, 1978. Therefore, at the time of the sale of hay, Bekins owed $200,000 to Huths plus interest on the delinquent amounts. The Huths and Fains later stipulated that the value of the hay crop sold to Huths was $185,846.20, and the proceeds were to be applied against Bekins' debts on the two loans. Significantly, when Huths resold the hay purchased from Bekins they were forced to sell at a lesser price than the price they had paid Bekins. Also, on April 19, 1978, Fain executed a bill of sale transferring Bekins' interest in the future 1978 hay crop to Huths. Because Huths determined that the value of the 1977 hay crop was sufficient to pay only the $100,000 due on the $100,000 note, plus interest, but not all of the additional first $100,000 installment which was past due on the $200,000 note, plus interest, Huths recorded a notice of default on the $200,000 note on May 10, 1978.

About one week later, Mr. Huth accompanied Fain to a meeting with Mutual to discuss the possibility of Mutual's increasing its loan to Bekins. But Mutual refused to consider increasing its loan until the $91,000 in accrued and past due interest on the existing $1.1 million loan was paid. To protect their own security position, Huths voluntarily paid the $91,000 in overdue interest to Mutual on June 1, 1978.

Some time during the same month, Bekins obtained a $240,000 loan from Rampart Development Company by pledging as collateral most of the same property already pledged to secure the loans from Huth, including the 1978 hay crop. From these additional funds, Bekins Ranch repaid Huth on some minor unsecured loans, and Huths directed the trustee of the $200,000 note and trust deed to postpone the foreclosure sale until at least January, 1979. Rampart was subsequently repaid the $240,000 from the proceeds of the 1978 hay crop.

Bekins Ranch then filed suit August 3, 1978 against Huth to enjoin foreclosure of the $200,000 trust deed and alleged that Bekins was not in default on the loan when the notice of default had been filed, and

foreclosure therefore would be wrongful, and that Bekins' title to its real estate had been slandered by the foreclosure action. The trial court issued a preliminary injunction March 28, 1979. Bekins then amended its complaint to allege that California law governed the validity of the loans, that both the $200,000 loan and the $100,000 loan were usurious under California law, and that the collection of any interest on the loans was unlawful as usurious. Huths denied that California law governed and counterclaimed for the amount due on the promissory notes and for Bekins' conversion of the 1978 hay crop which Bekins had originally conveyed to Huth but had sold to a third party, the proceeds from that sale having been used to pay Rampart.

At trial, the court ruled that because of changes in the law neither of the loans was usurious under either California or Utah law. That ruling is not attacked on this appeal. However, at the close of all the evidence, Bekins Ranch moved to amend its pleadings to allege for the first time the defense of unconscionability. Over objection, the trial court granted the motion.

In a memorandum decision that specifically indicates the trial judge's subjective reaction to the fairness of the transactions as the basis for his ruling, the trial court ruled that the loans were unconscionable under the Uniform Commercial Code, U.C.A., 1953, § 70A–2–302 and the Uniform Consumer Credit Code, U.C.A., 1953, § 70B–5–108. Consequently, the court substantially modified the contractual agreements and stipulations between the parties to reach what the trial court deemed to be an equitable result. The court also denied Bekins' recovery for wrongful foreclosure and slander of title and rejected Huths' claim that Bekins had wrongfully converted the 1978 hay crop to pay the Rampart loan. Finally, the court denied Huths' claim for attorney fees as provided for in the notes and trust deeds on the ground that Bekins was not in default on either the first or second loan when the foreclosure was commenced.

With respect to the $200,000 note, the first installment of which was due March 8 in the amount of $100,000, the court credited the proceeds of the sale of the 1977 hay crop on April 19, 1978, to Bekins in three installments corresponding to the estimated 1977 harvest dates, instead of crediting the proceeds as of the actual date of sale. The theory apparently was that Huths had constructive possession of the hay on each harvest date and therefore the $100,000 was not in default. Indeed, the effect of the court's allocation was to treat those three installments (i.e., the installments "constructively" made at the time of harvest) as prepayments on which Bekins Ranch was entitled to interest. Thus, according to the trial court, Bekins, rather than being in default on May 10, 1978 when Huth began foreclosure, had actually prepaid and even overpaid the $100,000 note and the $100,000 payment on the $200,000 note. To reduce further the perceived unconscionability of the loans, the court disallowed the $20,000 prepaid finance charge on the $100,000 note and denied Huth the contract interest of 10 percent on the delinquent balance of the $200,000 note and recovery on the $91,000 advance paid to Mutual on behalf of Bekins. The net result was a judgment for Huths in the amount of $178,830.

On this appeal, Huths contend that (1) the amendment of the pleadings to include the defense of unconscionability was error; (2) even assuming the amendment of the pleadings was proper, the loan transactions at issue were not unconscionable; (3) even if the ruling of unconscionability were correct, the court exceeded its powers in modifying the agreements so extensively; and (4) the court erred in denying Huths attorney fees.

Bekins cross-appeals, arguing (1) that the trial court, having held the loans unconscionable, should have also disallowed the $80,000 prepaid finance charge on the $200,000 note; and (2) that the court should have awarded damages for wrongful foreclosure based on its finding that Bekins was not in default when foreclosure was commenced.

1. The full text of U.C.A., 1953, § 70A-2-302 states:

## II.

With a few exceptions, it is still axiomatic in contract law that "[p]ersons dealing at arm's length are entitled to contract on their own terms without the intervention of the courts for the purpose of relieving one side or the other from the effects of a bad bargain." *Biesinger v. Behunin,* Utah, 584 P.2d 801, 803 (1978). Parties "should be permitted to enter into contracts that actually may be unreasonable or which may lead to hardship on one side." *Carlson v. Hamilton,* 8 Utah 2d 272, 275, 332 P.2d 989, 991 (1958). Although courts will not be parties to enforcing flagrantly unjust agreements, it is not for the courts to assume the paternalistic role of declaring that one who has freely bound himself need not perform because the bargain is not favorable. Of course, this general principle has its limits. An established exception is that if a contract is unconscionable, in whole or in part, the court may, on equitable grounds, refuse to enforce the unconscionable provisions, or it may construe the contract to avoid an unconscionable result. *E.g., Biesinger v. Behunin, supra,* at 803; *Russell v. Park City Utah Corp.,* Utah, 548 P.2d 889, 891 (1976); *Carlson v. Hamilton, supra,* 8 Utah 2d at 275, 332 P.2d at 991. *See also* 5 *Corbin on Contracts* §§ 1057, 1063, 1075 (1964); Note, 72 Yale L.J. 723 (1963).

In support of the trial court's ruling, Bekins urges that the loans are unconscionable under the Uniform Commercial Code and that therefore it was proper for the trial court to refuse to enforce the loan agreements as written. The argument advanced is that because the loans are secured in part by personal property, they are subject to the provisions of article nine of the U.C.C. (dealing with secured transactions) (U.C.A., 1953, § 70A-9-101 *et seq.*), and that through article nine the loans are subject to the unconscionability section of article two of the Code (dealing with sales), § 70A-2-302.[1] *See also* U.C.C. § 2-302 Official Comment (1978).[2]

Although the loans were partially secured by equipment and other personal property, they were principally secured by trust deeds on the real property. Huths' action was to foreclose the trust deeds. The conclusion that the unconscionability provision of the sales article is applicable through the secured transaction article is in error. Article nine does not apply to real estate transactions. Section 70A–9–104(j) of Utah's U.C.C. states: "This chapter does not apply ... to the creation or transfer of an interest in or lien on real estate ...." In the instant case, the disputed transaction is a foreclosure of a lien on real estate. Furthermore, the unconscionability provision of article two is inapplicable because that article "applies to transactions in goods; it does not apply to any transaction which ... is intended to operate only as a security transaction ...." § 70A–2–102.

Bekins also relies, as did the trial court, on the unconscionability provision of the Utah Uniform Consumer Credit Code, U.C.A., 1953, § 70B–5–108 and Comment of Commissioners.[3] However, that section, by its own terms, is also inapplicable because it applies only to consumer loans, § 70B–5–108(1), and excludes from its coverage "a charge or practice expressly permitted by this act." § 70B–5–108(3). The loans in this case are not "consumer loans" as defined by the Code because Huths are not persons "regularly engaged in the business of making loans" and because Bekins Ranch is "an organization" not "a person," as those terms are defined in § 70B–3–104.[4]

> Unconscionable contract or clause.
> (1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.
> (2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

2. The official comment to U.C.C. § 2–302 (1978) states:
> 1. ... The basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. Subsection (2) makes it clear that it is proper for the court to hear evidence upon these questions. The principle is one of the prevention of oppression and unfair surprise [citation omitted] and not of disturbance of allocation of risks because of superior bargaining power.

3. Section 70B–5–108 states in part:
> (1) With respect to a consumer credit sale, consumer lease, or consumer loan, if the court as a matter of law finds the agreement or any clause of the agreement to have been unconscionable at the time it was made, the court may refuse to enforce the agreement,

> or it may enforce the remainder of the agreement without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.
> (2) If it is claimed or appears to the court that the agreement or any clause thereof may be unconscionable, the parties shall be afforded a reasonable opportunity to present evidence as to its setting, purpose, and effect to aid the court in making the determination.
> (3) For the purpose of this section, a charge or practice expressly permitted by this act is not in itself unconscionable.
> . . . .

The corresponding Comment of the Commissioners on Uniform State Laws states:
> . . . .
> 2. This section is intended to make it possible for the courts to police contracts or clauses which are found to be unconscionable. The basic test is whether, in the light of the background and setting of the market, the commercial needs of the particular trade or case, and the condition of the particular parties to the contract, the contract or clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. The particular facts involved in each case are of utmost importance since certain contracts or contractual provisions may be unconscionable in some situations but not in others.

4. Section 70B–3–104 provides:
> Definition—"Consumer loan."
> (1) Except with respect to a loan primarily secured by an interest in land (section 70B–3–105), "consumer loan" is a loan made by a person regularly engaged in the business of making loans in which

Thus, the consumer loan provision of the U.C.C.C. explicitly rejects any maximum interest or finance charges when the borrower is a corporation or the lender is other than one who is in the business of making loans. *Centurian Corp. v. Cripps,* Utah, 624 P.2d 706 (1981); *Barnes v. Helfenbein,* Okl., 548 P.2d 1014 (1976). Furthermore, § 70B–3–605 of the Consumer Credit Code specifically authorizes parties to nonconsumer loans to "contract for the payment by the debtor of any loan finance charge,"[5] and unlike consumer loans there is no statutory limit on the amount that may be charged as a finance charge. *Centurian Corp. v. Cripps, supra,* at 711.

Although the unconscionability provisions of neither the U.C.C. nor the U.C.C.C. are applicable to the transactions at issue, a defense of unconscionability is nevertheless recognizable at common law. This Court has long held that unconscionable provisions of contracts are unenforceable. *Johnson v. Carman,* Utah, 572 P.2d 371 (1977); *Jacobson v. Swan,* 3 Utah 2d 59, 278 P.2d 294 (1954); *Perkins v. Spencer,* 121 Utah 468, 243 P.2d 446 (1952). Other courts have done likewise. In *Scott v. United States,* 79 U.S. (12 Wall.) 443, 445, 20 L.Ed. 438 (1870), the Supreme Court stated: "If a contract be unreasonable and unconscionable, but not void for fraud, a court of law will give to the party who sues for its breach damages, not according to its letter, but only such as he is equitably entitled to." *See also Williams v. Walker-Thomas Furniture Co.,* 350 F.2d 445 (D.C.Cir.1965); *Campbell Soup Co. v. Wentz,* 172 F.2d 80 (3rd Cir. 1948); *Henningsen v. Bloomfield Motors,*

Inc., 32 N.J. 358, 161 A.2d 69 (1960); 1 *Corbin on Contracts* § 128 (1963).

■ The determination of whether a contract is unconscionable is usually made with respect to the conditions that existed at the time the contract was made, and without regard for the parties' subsequent conduct and dealings. *E.g., Barnes v. Helfenbein,* Okl., 548 P.2d 1014 (1976); *Bill Stremmel Motors, Inc. v. IDS Leasing Corp.,* 89 Nev. 414, 514 P.2d 654 (1973); *In re Estate of Frederick,* Wyo., 599 P.2d 550 (1979). *See also* U.C.A., 1953, § 70B–5–108 comment 2.[6] Furthermore, analysis of the relevant interests to be evaluated may be promoted by distinguishing between substantive considerations, which focus on the terms of the contract, and procedural considerations, which refer to the relative positions of the parties and the circumstances surrounding the execution of the contract. *See, e.g., Christiansen Brothers, Inc. v. State,* 90 Wash.2d 872, 877–78, 586 P.2d 840, 843–44 (1978).

■ Procedural considerations are particularly pertinent in consumer contracts of adhesion. *Williams v. Walker-Thomas Furniture Co.,* 350 F.2d 445 (D.C.Cir.1965), a leading case on unconscionability states:

Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party. Whether a meaningful choice is present in a particular case can only be determined by consideration of all

(a) the debtor is a person other than an organization;
(b) the debt is incurred primarily for a personal, family, household, or agricultural purpose;
(c) either the debt is payable in installments or a loan finance charge is made; and
(d) either the principal does not exceed $25,000 or the debt is secured by an interest in land.

**5.** The trial court held § 70B–3–605 of the U.C.C.C. inapplicable because the comment states it is intended to remove interest limitations on high risk business loans, and the court did not consider Huth's loans high risk. We disagree.

Loans of the type involved in this case secured by second and third trust deeds on property already mired in bankruptcy are clearly high risk.

**6.** However, this Court has held that a forfeiture provision in a real estate contract which is not invalid at the time of its making may become unconscionable as to a defaulting purchaser if the amount forfeited is wholly disproportionate to the rental value of the property. *Johnson v. Carman,* Utah, 572 P.2d 371 (1977); *Jacobson v. Swan,* 3 Utah 2d 59, 278 P.2d 294 (1954); *Perkins v. Spencer,* 121 Utah 468, 243 P.2d 446 (1952).

the circumstances surrounding the transaction. In many cases the meaningfulness of the choice is negated by a gross inequality of bargaining power. The manner in which the contract was entered is also relevant to this consideration. Did each party to the contract, considering his obvious education or lack of it, have a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print and minimized by deceptive sales practices? . . .

In determining reasonableness or fairness, the primary concern must be with the terms of the contract considered in light of the circumstances existing when the contract was made. The test is not simple, nor can it be mechanically applied. The terms are to be considered "in the light of the general commercial background and the commercial needs of the particular trade or case."

*Id.* at 449–50 (footnotes omitted). *See also Barnes v. Helfenbein,* Okl., 548 P.2d 1014 (1976). Additional factors which bear upon unconscionability are: 1) "[t]he use of printed form or boilerplate contracts drawn skillfully by the party in the strongest economic position," *Wille v. Southwestern Bell Telephone Co.,* 219 Kan. 755, 758, 549 P.2d 903, 906 (1976); 2) excessive price or interest; 3) phrasing clauses in language that is incomprehensible to a layman or that divert his attention from the problems raised by them or the rights given up through them; 4) an overall imbalance in the obligations and rights imposed by the bargain; 5) "exploitation of the underprivileged, unsophisticated, uneducated and the illiterate," *id.* at 759, 549 P.2d at 907; 6) contract terms "so one-sided as to oppress or unfairly surprise an innocent party," *Bill Stremmel Motors, Inc. v. IDS Leasing Corp.,* 89 Nev. 414, 418, 514 P.2d 654, 657 (1973); and 7) lack of opportunity for meaningful negotiation, *In re Estate of Frederick,* Wyo., 599 P.2d 550 (1979). For the most part these considerations are relevant to consumer loans, although they may also, to varying degrees, be pertinent to nonconsumer loans.

In the instant case, we do not deal with a consumer contract. Both parties were experienced business people. There was no overreaching by use of any of those factors mentioned above. Nor can we say that because Bekins was desperate an unusually high premium or rate of interest evidences unconscionability by itself. Such a view would have the effect of closing off sources of capital to businesses which may need high risk capital to survive.

*Barnes v. Helfenbein,* Okl., 548 P.2d 1014 (1976), is closely on point. In *Barnes,* the borrower, whose property was already subject to a $423,000 mortgage that was in default and in the process of foreclosure, contacted another lender seeking a new mortgage loan. The loan terms were negotiated and explained to the borrower by her attorney, and the borrower indicated her understanding and approval of the transaction. The borrower executed a $600,000 promissory note due seven months later, secured by the real property, bearing interest at the rate of 38.5 percent, and calling for prepayment of a $100,000 finance charge. The borrower defaulted, and the lender instituted a foreclosure action. The trial court held the interest rate was unconscionable and reduced it to 10 percent. The Oklahoma Supreme Court reversed, ruling the loan was a nonconsumer loan and not subject to the U.C.C.C. After referring to several of the considerations stated above for determining unconscionability, the court observed that the borrower was an astute businesswoman with extensive experience, she sought out the loan, fully understood the agreement, voluntarily signed it without any pressure or undue influence, and she had other viable alternatives to the loan, such as selling the property for a substantial profit. The court concluded:

The parties in the exercise of their inherent contractual rights may make whatever bargain they desire. It is the duty of the court to enforce valid voluntary contracts. The court will not interfere with the contract of parties in the absence of fraud, duress, undue influence or mistake.

Courts are concerned only with the legality of the contract. The fairness or unfairness, folly or wisdom, or inequality of contracts are questions exclusively within the rights of the parties to adjust at the time the contract is made.

*Id.* at 1021.

■ The availability of high risk capital is essential to the functioning of our economic system. New enterprises with untested products often require high cost capital, as do ventures whose viability is uncertain for whatever reason. Bekins argues that the finance charges on the loans, amounting to 36.3 percent on the $200,000 loan and 58 percent on the $100,000 loan, and the security taken for the loans, were excessive. Although the finance charges are high by some standards, we do not think they were unconscionable. Bekins was struggling through a bankruptcy and had encumbered the ranch by a first mortgage loan of $1.1 million from Mutual. Huths' subsequent loans to Bekins, which proved necessary because of obvious underfinancing of the ranch operation, were clearly high risk. Acquisition of high risk capital almost always requires the payment of a premium. It is not sound legal policy to establish rules so strict as to unnecessarily dampen legitimate and desirable business activity. The comment of the U.C.C.C. commissioners appended to section 70B–3–605, which removed the limits on finance charges for nonconsumer loans, states the principle:

In the belief that there is little place for usury limitations in sophisticated business transactions, this section follows those states which exempt loans to corporations from their usury laws and extends the exemption to other organizations as well. Placing arbitrary ceilings on the amount of interest which can be charged in larger business transactions may prevent persons engaged in high risk business ventures from obtaining needed capital loans. It is impossible to measure how much is too much interest with respect to large business transactions. If the limit is set so high as to provide adequately for speculative business ventures the limit becomes virtually meaningless for most transactions. If it is set at a level close to the top of the range for most business transactions it will preclude loans for extraordinary ventures. Hence, in this residual category the parties may contract for any loan finance charge they desire.

Huths' loans to Bekins were between sophisticated business people who were well aware that they were dealing with highly speculative business transactions. The financial agreements necessary to rescue the ranch could only have been consummated by Fain offering inducements commensurate with the risks assumed by Huths. Certainly, if the terms of the loans and the extent of the security offered to secure the loans were as excessive as Fain now contends, it seems highly likely that Fain could have struck a better bargain elsewhere, but he could not do so. Although it is true that Fain was operating under Mutual's threat to withdraw its loan, the failure of other prospective lenders to step forward emphasizes not only the dire straits of Fain but equally emphasizes the nature of the risk assumed by the Huths.

Nor do we find any procedural unconscionability in the making of the loan contracts. Counsel for Bekins portray James Fain as a humble, simple-minded, bankrupt hay farmer who innocently stumbled into an unscrupulous scheme to dispossess him of his ranch. They relate that he was frantically seeking a loan on all sides in order to preserve the loan commitment from Mutual, that he had no bargaining power, no other alternative, and was forced to accept Huths' terms or lose the ranch, and that "[t]he quagmire that then began to engulf them was not of their choosing but was engineered by the Appellants to further entrap them in an inextricable bag of unfavorable circumstances."

This portrayal, however, is inconsistent with the findings of the trial court that the

parties dealt in good faith, that they had had prior and subsequent successful dealings and held no antagonism toward the other, before or after the loans at issue. "It seems to me," observed the trial court, "like this is a lawsuit that could be between brothers or close friends." Of Fain, the court observed that "he's energetic, he's imaginative," and while "[h]e may be imprudent," he was astute enough to successfully negotiate the favorable $1.1 million loan commitment from Mutual, and he "is intelligent enough to know that he was paying this money" to Huths. The court concluded, "I thus have an affirmative picture of James Fain. Now, to turn the coin over, I have an equally affirmative picture of Mr. Stanley Huth.... I see no evidence of the shylock in Mr. Huth.... He charged a great deal of money for his services, which is appropriate and proper."

Furthermore, the evidence shows that Fain sought out Huth, freely negotiated the terms and voiced no objection to them at the time, and that Bekins' bankruptcy trustee also approved the loans. Nor is there evidence of fraud, deception, or unfair surprise or exploitation. While the parties' relative bargaining positions were unequal because of Bekins' financial need, that was precisely why the loan was risky and naturally called for a loan agreement that took that risk into account. We believe that Bekins' claim that the ranch would necessarily have been lost if Fain had not signed the Huth contracts is exaggerated. As Huths point out, Bekins could have either sold a portion of the ranch property, valued at $2.7 million, to obtain the needed $120,-000, or it could have sought the additional $120,000 from Mutual, which had already once before agreed to a $100,000 increase over the original $1 million. Bekins claims an additional request to Mutual would have risked losing the $1.1 million already committed. If such were the case, it merely suggests that Mutual was not confident that Bekins would be able to repay the loan commitment plus an additional $120,000. To find unconscionability on these facts

would discourage other lenders from advancing funds to businesses that find themselves in financial difficulty because of the possibility that a court would disallow the cost of high risk capital.

### III.

Huths contend the trial court erred in allowing the pleadings to be amended late in the trial to permit the issue of unconscionability to be raised. Rule 15(a) states that leave to amend "shall be freely given when justice so requires." A primary consideration that a trial judge must take into account in determining whether leave should be granted is whether the opposing side would be put to unavoidable prejudice by having an issue adjudicated for which he had not had time to prepare. Generally, therefore, the matter calls for the exercise of sound discretion. *Big Butte Ranch Inc. v. Holm,* Utah, 570 P.2d 690 (1977). *See also First Security Bank v. Colonial Ford Inc.,* Utah, 597 P.2d 859 (1979). On the facts of this case, there was no error in allowing the amendment. We do not think the record needed to be amplified by either party to permit a proper adjudication of the issue of unconscionability.

### IV.

We also conclude that the trial court erred when it allocated the proceeds of the 1977 hay crop on the theory that Huths had constructive possession of the hay prior to the time the hay was transferred to them. In fact, Bekins had actual possession of the hay and exercised the power of ownership by attempting to sell the crop on several occasions to third persons, but the price offered was less than Bekins would accept. The subsequent purchase by Huths of the 1977 crop and its resale resulted in a loss to Huths. Clearly there is no foundation for the trial court's conclusion that the proceeds of the 1977 hay crop should have been credited to Huths as

the crop was harvested and the trial court therefore erred in holding that the $100,000 loan was not in default when the hay was actually sold to Huths. It follows that both the $100,000 note and the $200,000 note were in default at the time of the sale of the 1977 hay crop to Huths.

In short, the notes should be enforced as written, with the 1977 hay proceeds credited as of the actual sale date on April 19, 1978, and with other credits or charges figured accordingly.

Reversed and remanded for a redetermination of the amounts due on the promissory notes and a determination of attorneys fees. Costs to appellants.

HALL, C.J., and OAKS, HOWE and DURHAM, JJ., concur.