2006 UT App 321

**THE CANTAMAR, L.L.C., Plaintiff and Appellee,**

v.

**Carlton J. CHAMPAGNE; Lon E. Williams; and Data Systems International, Inc., Defendants and Appellants.**

No. 20050778–CA.

Court of Appeals of Utah.

Aug. 3, 2006.

Rehearing Denied Sept. 18, 2006.

Chris L. Schmutz, Schmutz Mohlman & Rohbock, Bountiful, for Appellants.

Stephen C. Tingey, Benjamin J. Kotter, Ray Quinney & Nebeker, Salt Lake City, for Appellee.

Before Judges BILLINGS, McHUGH, and THORNE.

## OPINION

BILLINGS, Judge:

¶1 Defendants Carlton J. Champagne, Lon E. Williams, and Data Systems International, Inc. (collectively, DSI) appeal the trial court's grant of summary judgment

to Plaintiff The Cantamar, LLC (Cantamar). On appeal, DSI maintains the trial court erred in concluding the contract between the parties was unambiguous and integrated as a matter of law. DSI also argues the trial court erred in not addressing the existence of a condition precedent and in declining to consider DSI's claim of fraudulent inducement. Finally, DSI contends that genuine issues of material fact exist as to whether the contract's default interest rate constitutes an unenforceable penalty and as to whether a unilateral or mutual mistake occurred. We affirm in part and reverse and remand in part.[1]

## BACKGROUND

¶2 On January 11, 2002, DSI met with Troy Thuett (Thuett), a loan broker, with whom DSI had worked for nearly two years to obtain an investment and loans for DSI. At this meeting, DSI executed a promissory note (the Note), agreeing to pay Cantamar $269,285.07 plus interest. The Note constituted a refinancing of prior obligations DSI owed Commercial Lending Group, a separate lender from Cantamar.

¶3 Under the Note's terms, DSI agreed that prior to May 11, 2002 (the Due Date), interest would accrue on the principal at a rate of 8% per annum, and after the Due Date, interest would accrue at a rate of 30% per annum.[2] The terms of the Note also stated that: "[t]he unpaid principal and accrued interest [was] payable in monthly installments of $1,795.23, beginning on February 11, 2002, and continuing until [the Due Date], at which time the remaining unpaid principal and interest [were] due in full"; DSI "promise[d] to pay a late charge of

---

1. Cantamar argues that DSI did not properly preserve all the named issues for appeal because DSI raised several of these issues in response to Cantamar's original motion for summary judgment but did not raise the issues again in its response to Cantamar's renewed motion for summary judgment. We conclude DSI properly preserved the issues for appeal. *See Brookside Mobile Home Park, Ltd. v. Peebles*, 2002 UT 48, ¶¶ 13–15, 48 P.3d 968 (holding that a party who raises an issue in support of its original motion for summary judgment has preserved the issue for appeal even if the party does not raise the issue again in a renewed motion for summary

judgment—"once trial counsel has raised an issue before the trial court, and the trial court has considered the issue, the issue is preserved for appeal").

2. The interest rates agreed to under the Note were significantly lower than the rates under the previous notes owed to Commercial Lending Group. The interest rate on the March 1, 2001 note was 72% per annum with no default interest rate. The interest rate on the July 30, 2001 note was 60% per annum with a default interest rate after the due date of 120%.

$250.00 for each installment that remain[ed] unpaid more than 10 day(s) after [the] Due Date"; "[i]f any installment [was] not paid when due, the remaining unpaid principal balance and accrued interest [would] become due immediately at the option of [Cantamar]"; "[i]f any payment obligation under th[e] Note [was] not paid when due, [DSI] promise[d] to pay all costs of collection, including reasonable attorney fees, whether or not a lawsuit [was] commenced as part of the collection process." DSI members Williams and Champagne signed the Note, and on January 17, 2002, they "both together and individually unconditionally guarantee[d] all the obligations of [DSI] under th[e] Note."

¶ 4 At the time of the Due Date, DSI had made interest payments for the months of February, March, April, and May 2002. On the Due Date, DSI did not pay the principal owed under the Note, and DSI has not made an interest payment since May 2002. The current amount owing on the Note is the principal amount of $269,285.07 plus $47,124.89 in interest accrued up to and including December 11, 2002, plus all interest that has accrued thereafter at a rate of 30% per annum until DSI pays the principal in full.

¶ 5 On January 13, 2003, Cantamar brought an action against DSI to collect on the Note. DSI answered Cantamar's complaint on February 11, 2003. On June 17, 2003, Cantamar moved for summary judgment. In May 2004, the trial court denied Cantamar's motion for summary judgment, concluding there were issues of material fact and expressing concern as to "the issue of integration and the issue of condition[ ] precedent," where DSI alleged a prior or contemporaneous oral agreement under which DSI was not required to repay the loans until Thuett obtained a $15 million investment for DSI. After the trial court's denial of its motion for summary judgment, Cantamar deposed Champagne, the chief executive officer of DSI; Brian Bingel, the acting president and chief operating officer of DSI; and Gary Smith, a former employee of DSI. DSI deposed Glenn Britt, the managing member of Cantamar. At the conclusion of these depositions, on May 3, 2005, Cantamar renewed

its motion for summary judgment. On September 6, 2005, the trial court granted Cantamar's renewed motion for summary judgment, concluding that: DSI was obligated as maker of the Note; Champagne and Williams were liable as guarantors of the Note; the Note was unambiguous; the Note was an integrated agreement as a matter of law; DSI's "alleged condition precedent to the effectiveness of the Due Date ha[d] failed, making the Note due and payable in full"; "DSI [was] in default under the terms of the Note"; and DSI, Champagne, and Williams were jointly and severally liable to Cantamar for $269,285.07 in unpaid principal, $47,124.89 in interest up to and including December 11, 2002, any further interest accrued after December 11, 2002, at the contract rate of 30%, $30,243 in attorney fees, and $1,373.87 in legal costs. DSI appeals.

## ISSUE AND STANDARD OF REVIEW

¶ 6 On appeal, DSI argues the trial court improperly granted Cantamar's motion for summary judgment. Under Utah Rule of Civil Procedure 56(c), "summary judgment is only appropriate where 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.'" *Ford v. American Express Fin. Advisors, Inc.*, 2004 UT 70, ¶ 9, 98 P.3d 15 (quoting Utah R. Civ. P. 56(c)) (other quotations and citation omitted). Because "[t]he propriety of a trial court's summary judgment order is a matter of law," *Russell v. Lundberg*, 2005 UT App 315, ¶ 9, 120 P.3d 541, "'we need review only whether the trial court erred in applying the relevant law and whether a material fact was in dispute,'" *Ford*, 2004 UT 70 at ¶ 9, 98 P.3d 15 (quoting *WebBank v. American Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 13, 54 P.3d 1139). "On review of a grant of summary judgment, we view the facts, and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *McEwan v. Mountain Land Support Corp.*, 2005 UT App 240, ¶ 10, 116 P.3d 955.

## ANALYSIS

¶ 7 DSI asks this court to reverse the trial court's grant of Cantamar's motion for sum-

mary judgment because the trial court erroneously concluded the Note is unambiguous and integrated as a matter of law, did not address the existence of a condition precedent, and failed to consider DSI's fraudulent inducement claim. DSI also contends this court should reverse because genuine issues of material fact exist as to whether the default interest rate DSI agreed to under the terms of the Note constitutes an unenforceable penalty and as to whether a unilateral or mutual mistake occurred in the parties' omission of a written provision in the Note referencing the alleged oral agreement. We consider each claim.

## I. Integration and Condition Precedent

¶ 8 DSI contends the trial court erroneously determined the Note is integrated as a matter of law. Therefore, DSI claims this court should reverse and remand to the trial court to determine whether, in light of all relevant evidence, including parol evidence, the Note is integrated and whether that integration is complete or partial.

¶ 9 Utah courts have held that "[a]bsent fraud or other invalidating causes, the integrity of a written contract is maintained by not admitting parol evidence to vary or contradict the terms of the writing once it is determined to be an integration." *Union Bank v. Swenson*, 707 P.2d 663, 665 (Utah 1985). "An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement." Restatement (Second) of Contracts § 209(1) (1981). An integrated agreement may be completely or partially integrated. *See Novell, Inc. v. Canopy Group, Inc.*, 2004 UT App 162, ¶ 15, 92 P.3d 768; *see also* Restatement (Second) of Contracts § 210(1)-(2) (distinguishing between partially and completely integrated agreements).

¶ 10 Regardless of "whether [an agreement is] completely or partially integrated, evidence of prior or contemporaneous agreements or discussions is not admissible to contradict terms of the written agreement." *Novell*, 2004 UT App 162 at ¶ 15, 92 P.3d 768 (quotations and citations omitted). However, where a party seeks to introduce supplementary rather than contradictory evidence, its ability to do so depends on whether the agreement is partially or completely integrated. While a party cannot introduce supplementary terms to a completely integrated agreement, *see* Restatement (Second) of Contracts § 216(1), when an agreement is partially integrated, "[p]arol evidence not inconsistent with the writing is admissible to show what the entire contract really was, by supplementing, as distinguished from contradicting, the writing." *Novell*, 2004 UT App 162 at ¶ 15, 92 P.3d 768 (quotations and citations omitted). Where a party seeks to introduce supplementary terms to a partially integrated agreement, "parol evidence to prove the part not reduced to writing is admissible, although it is not admissible as to the part reduced to writing." *Id.*

¶ 11 Thus, before a trial court applies the parol evidence rule, it must determine as questions of fact: (1) whether the agreement is integrated and, if so, (2) whether that integration is complete or partial. *See Eie v. St. Benedict's Hosp.*, 638 P.2d 1190, 1194 (Utah 1981) (" '[T]he court must determine as a question of fact whether the parties did in fact adopt a particular writing or writings as the final and complete expression of their bargain.' " (quoting *Bullfrog Marina, Inc. v. Lentz*, 28 Utah 2d 261, 501 P.2d 266 (1972))). Additionally, if the court determines an agreement is partially integrated, it must also consider whether the parol evidence the parties seek to introduce is inconsistent or supplementary to the agreement. *See Novell*, 2004 UT App 162 at ¶ 15, 92 P.3d 768. In resolving these preliminary questions, parol evidence, " 'indeed any relevant evidence, is admissible.' " *Smith v. Osguthorpe*, 2002 UT App 361, ¶ 18, 58 P.3d 854 (explaining that any relevant evidence is admissible in determining whether agreement is integrated) (quoting *Union Bank*, 707 P.2d at 665); Restatement (Second) of Contracts § 210 cmts. b-c (stating that "any relevant evidence" is admissible when considering whether an agreement is completely or partially integrated); *id.* § 213 cmt. b (directing that determination of whether a term is inconsistent with an integrated agreement is "made in accordance with all relevant evidence").

¶ 12 Importantly, when addressing the preliminary question of integration, courts apply "a rebuttable presumption that a writing which on its face appears to be an integrated agreement is what it appears to be." *Union Bank*, 707 P.2d at 665 (citing Restatement (Second) of Contracts § 209(3)).[3] To rebut this presumption on summary judgment, the party must "raise[ ] a genuine issue of material fact as to whether the writing was in fact integrated." *Id.* at 666 (explaining that although the agreement facially appeared to be integrated, "appellants' pleadings and affidavits in opposition to summary judgment d[id] raise a genuine issue of material fact requiring a specific determination as to whether the note was an integration"). A party may introduce "all relevant evidence" to rebut the presumption. *Id.* at 665. If the party successfully rebuts the presumption of integration, the trial court must then make a specific factual determination as to whether the agreement was in fact integrated. *See id.* at 666.

¶ 13 Here, the trial court concluded that the Note appears on its face to be integrated and DSI's alleged oral agreement failed to rebut the presumption of integration. We concur with the trial court's conclusion that the Note appears on its face to be a final expression of the parties' agreement, and thus we presume the parties intended the Note to constitute an integrated agreement. However, we disagree with the trial court's determination that DSI failed to rebut the presumption of integration. Conversely, we conclude that DSI successfully rebutted the presumption of integration where DSI's pleadings and affidavits in opposition to summary judgment allege that: (1) at the time DSI signed the Note, Thuett indicated that it was a consolidation of previous notes and, as purportedly with previous notes, DSI was not required to repay the Note until and unless Thuett obtained a $15 million investment for DSI; (2) Thuett promised the investment was imminent and under-

stood the oral agreement was critical since there were no means for DSI to repay the loan without an investment; and (3) without the oral agreement DSI would not have accepted the loans or signed the Note. *See id.* (holding that where defendants' pleadings and affidavits alleged the plaintiff indicated the purpose of the loan was not to create personal liability; the plaintiff made specific oral misrepresentations that led defendants "to believe they would not be held personally liable[; and] without the misrepresentations [defendants] would not have personally signed the note," defendants had, despite the note appearing to be facially integrated and the presumption of integration applied to such agreements, raised "a genuine issue of material fact as to whether the parties assented to the writing as a final statement of the intended agreement or executed it for some other purpose").

¶ 14 We conclude DSI rebutted the presumption of integration and a genuine issue of material fact exists as to whether the Note is integrated. Therefore, we reverse and remand for a determination of whether in light of " 'any relevant evidence,' " including parol evidence, *Novell, Inc. v. Canopy Group, Inc.*, 2004 UT App 162, ¶ 11, 92 P.3d 768 (citation omitted), the Note constitutes a completely or partially integrated agreement. *See Union Bank v. Swenson* 707 P.2d 663, 665–66, 669 (Utah 1985) (reversing and remanding to the trial court to make "a specific determination as to whether the note was an integration" and stating that "all relevant evidence is admissible on the threshold issue of whether the writing was adopted by the parties as an integration of their agreement"). We make clear, however, that if on remand the trial court determines the Note is a partially or completely integrated agreement, the parties may not introduce parol evidence of any terms contradictory to the terms reduced to writing such as the Due Date and the applicable interest rates.[4] *See Novell*, 2004 UT App 162 at ¶ 15, 92 P.3d 768.

---

3. Restatement (Second) of Contracts section 209(3) states that an agreement that "in view of its completeness and specificity reasonably appears to be a complete agreement . . . is taken to be an integrated agreement unless it is established by other evidence that the writing did not

constitute a final expression." Restatement (Second) of Contracts § 209(3) (1981).

4. Except as to DSI's allegations of fraud discussed in the following section.

¶ 15 We also emphasize that to determine whether the alleged oral agreement is integrated and whether that integration is complete or partial, the trial court must necessarily address whether a condition precedent existed that Cantamar would not enforce the Note until and unless Thuett obtained an investment. This is because evidence of an alleged oral agreement "bears directly on the issues whether the writing was adopted as an integrated agreement and if so whether the agreement was completely integrated or partially integrated." Restatement (Second) of Contracts § 217 cmt. b (1981). Specifically, "[i]f the parties orally agreed that performance of the written agreement was subject to a condition, either the writing is not an integrated agreement or the agreement is only partially integrated until the condition occurs." *Id.*

¶ 16 If on remand the trial court concludes that Thuett's finding investment funds was a condition precedent to DSI's repayment of the Note, we point out that both parties concede this alleged condition has failed. The Utah Supreme Court has stated that "[f]ailure of a material condition precedent relieves the obligor of any duty to perform." *Harper v. Great Salt Lake Council, Inc.,* 1999 UT 34,¶ 14, 976 P.2d 1213. In other words,

> where the duty of the obligor to perform is contingent upon the occurrence or existence of a condition precedent, the obligee may not require performance by the obligor, because the obligor's duty, and conversely the obligee's right to demand performance, does not arise until that condition occurs or exists.

*Id.*

¶ 17 Importantly, however, if, on the contrary, the trial court determines that there was no condition precedent and that the parties intended that DSI's repayment of the Note would be absolute and fixed upon Thuett's finding an investment as merely a convenient time for repayment, "the law will require payment to be made within a reasonable time." *North Am. Graphite Corp. v. Allan,* 184 F.2d 387, 390 (D.C.Cir.1950) (explaining that if the trial court determines the

parties did not intend the debt to be contingent and instead "intend[ed] that [the] debt [would] be absolute, and fix[ed] upon the future event as a convenient time for payment merely . . ., if the future event does not happen as contemplated, the law will require payment to be made within a reasonable time"); *see also Mularz v. Greater Park City Co.,* 623 F.2d 139, 144 (10th Cir.1980) ("[W]here, as here, a debt constitutes an absolute rather than a contingent liability, and payment was agreed to be made on the occurrence of an event which does not occur, payment must be made within a reasonable time."); *Envirocorp Well Servs., Inc. v. Camp Dresser & McKee, Inc.,* IP 99–1575–C–T/G, 2000 WL 1617840 at *5, 2000 U.S. Dist. LEXIS 16088, at *17 (S.D.Ind. Oct. 25, 2000) (" 'It is well settled that, if there was a debt in existence and payment is merely postponed until the happening of a contingency which does not happen, the law requires payment to be made within a reasonable time.' " (citation omitted)); *Busby v. Century Gold Mining Corp.,* 27 Utah 231, 75 P. 725, 727 (1904) ("When the money was loaned, the debt was created and became absolute, and the provisos in the written instrument that the money should be repaid out of the first profits of the company merely fixes the happening of such an event as a convenient time for making the payment, and in case no profit should be realized the law implies a promise to pay within a reasonable time."); *Engle v. First Nat'l Bank of Chugwater,* 590 P.2d 826, 831 (Wyo.1979) ("A debt conditioned on the happening of an event cannot be enforced until the event happens, but where the debt is actually in existence, and payment merely postponed until the happening of an event which does not happen, payment must be made within a reasonable time and that depends upon the circumstances of each case.").

¶ 18 Although we note that regardless of whether the trial court determines a condition precedent existed, DSI does not contend the interest payments to which it agreed to in signing the Note were subject to a condition precedent. Thus, under the Note's terms, these payments are immediately due and payable in full. Likewise, if no condition

precedent exists, the principal of the Note is also now due.

¶ 19 In conclusion, we determine the trial court erred in concluding the Note is integrated as a matter of law. We therefore reverse the trial court's grant of summary judgment as to the issue of integration and remand for the trial court to determine whether, in consideration of all relevant evidence, including parol evidence, the Note is an integrated agreement and whether that integration is complete or partial. To make such determinations, the trial court will necessarily need to consider whether a condition precedent existed—that is, was there a contemporaneous oral agreement that Cantamar would not enforce the Note until and unless Thuett obtained a $15 million investment.

## II. Fraudulent Inducement

¶ 20 DSI also argues that because it pleaded fraudulent inducement as an affirmative defense, the trial court erred in excluding parol evidence of the alleged oral agreement and in neglecting to address DSI's claim that Thuett fraudulently induced DSI to enter into the written agreement. We agree.

¶ 21 The Utah Supreme Court has held that "[p]arol evidence is admissible to prove that a party was induced into a contract by fraud." *Union Bank v. Swenson,* 707 P.2d 663, 666 (Utah 1985). This is true even if an agreement is integrated, that integration is complete, and the proffered parol evidence contradicts the terms of the agreement. *See id.* at 665–66; *see also* Arther Linton Corbin, *Corbin on Contracts* § 580 (1979) ("[O]ral testimony is admissible to prove fraud.... This is so, even though the testimony contradicts the terms of a complete integration in writing.... [And] fraud in the inducement of assent ... may make the contract voidable without preventing its existence, and without showing that the writing was not agreed on as a complete integration of its terms. In such case the offered testimony may not vary or contradict the terms of the writing, although it would be admissible even if it did so; it merely proves the existence of collateral factors that have a legal operation of their own, one that prevents the written contract from having the

legal operation that it would otherwise have had.").

¶ 22 Yet, despite this rule, Cantamar asserts that DSI "cannot claim fraud in the inducement when the written contract clearly states a Due Date contrary to the alleged fraud." Cantamar argues that those cases allowing for the introduction of parol evidence when a party claims fraudulent inducement are distinguishable from the present case because the fraudulent inducement alleged in those cases was "that the very nature of the documents [was] different than that stated in the documents." That is, in the cases of *Union Bank* and *Berkeley Bank for Cooperatives v. Meibos,* 607 P.2d 798 (Utah 1980), the "artifice which was used to induce the signing went, in effect, to the nature of the documents signed rather than to the actual contents of the documents." *Id.* at 804 (stating that bank officers indicated to defendants that their personal signatures on the notes were not for collection purposes but to ensure the defendant farmers would continue to ship milk to cooperative); *see also Union Bank,* 707 P.2d at 664 (explaining that bank representatives told defendants their personal "signatures were for appearances only and no collection action would be brought against them personally"). In contrast, Cantamar asserts that DSI's claim of fraudulent inducement is based on misrepresentations as to the content of the Note, and thus, under *Johnson v. Allen,* 108 Utah 148, 158 P.2d 134 (1945), DSI's claim is barred. In *Johnson,* the supreme court affirmed the trial court's grant of summary judgment for failure to demonstrate facts sufficient to support a claim of fraudulent inducement, *see id.* at 138, where the defendant claimed "the plaintiff induced the defendant to sign [a] listing contract by misrepresenting that the listing was for only sixty days when in fact it specified six months," *id.* at 137.

¶ 23 However, despite Cantamar's contentions, *Johnson* is distinguishable from the instant case for several reasons. First, in *Johnson,* the court actually did consider parol evidence despite the defendant's fraudulent inducement claims being based on misrepresentations as to the content of the agreement. *See id.* at 138 (refusing to sub-

mit question of fraud to jury because "it is error to submit a question of fraud to the jury upon slight parol evidence"). Second, unlike the defendant in *Johnson*, DSI does not assert that Thuett induced it to sign the Note by misrepresenting that the Note did not state the Due Date as May 11, 2002, when in fact it clearly did. Rather, DSI argues that Thuett induced it to sign the Note by misrepresenting that the Due Date was a provision that Cantamar would not enforce. Thus, the present case is more analogous to *Swanson v. Sims*, 51 Utah 485, 170 P. 774 (1917). In that case, the Utah Supreme Court allowed contradictory parol evidence of fraudulent inducement where, like here, defendant alleged he only executed the written contract containing disputed provisions because plaintiff orally assured him that these provisions would not be enforced. *See id.* at 776.

¶ 24 In short, we hold the trial court erred in failing to address DSI's claim of fraudulent inducement based on parol evidence of statements as to when the Note would be enforced. We therefore remand for the trial court to consider DSI's fraudulent inducement claim.

### III. Ambiguity

¶ 25 DSI next contends the trial court erroneously concluded the Note is unambiguous. Specifically, DSI argues the Note is ambiguous because (1) the Due Date was "unimportant" since none of the due dates on prior notes had been enforced; and (2) the Note, although "unconditional in form, [was] in practice conditional" and therefore "the Note as a whole is ambiguous because its true character is not fully expressed in the language of the Note."

¶ 26 First, "[w]hen determining whether a contract is ambiguous, *any relevant* evidence must be considered."[5] *Ward v. Intermountain Farmers Ass'n*, 907 P.2d

264, 268 (Utah 1995) (emphasis added). This rule is based on the well-recognized principle of contract interpretation that " 'the intentions of the parties are controlling.' " *Id.* at 269 (quoting *Winegar v. Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991)). That is, by requiring " 'at least a preliminary consideration of *all credible* evidence offered to prove the intention of the parties . . . the court can place itself in the same situation in which the parties found themselves at the time of contracting.' " *Id.* at 268 (emphasis added) (omission in original) (quoting *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641, 645 (1968)) (additional quotations and citation omitted). "Otherwise, the determination of ambiguity is inherently one-sided, namely, it is based solely on the 'extrinsic evidence of the judge's own linguistic education and experience.' " *Id.* (additional quotations and citations omitted). Such a one-sided approach to an ambiguity determination is undesirable because "[a]lthough the terms of an instrument may seem clear to a particular reader—including a judge—this does not rule out the possibility that the parties chose the language of the agreement to express a different meaning." *Id.*

¶ 27 Second, if in light of all credible relevant evidence, the court concludes the contract's language is indeed ambiguous, then the court may allow the parties to introduce extrinsic evidence to resolve any ambiguities. *See id.* ("If after considering [all credible, relevant] evidence the court determines that the interpretations contended for are reasonably supported by the language of the contract, then extrinsic evidence is admissible to clarify the ambiguous terms."). "Conversely, if after considering such evidence, the court determines that the language of the contract is not ambiguous, then the parties' intentions must be determined solely from the language of the contract." *Id.*

---

5. In *Gillmor v. Macey*, 2005 UT App 351, 121 P.3d 57, *cert. denied*, 126 P.3d 772 (Utah 2005), this court explained that it considered the establishment of this rule to constitute

    [a] reject[ion of] the strict application of the "four corners" rule, which limits the boundaries of inquiry into whether an ambiguity

exists in a contract to the contract's "four corners" and effectively excludes the evidence of any surrounding circumstances—outside of the writing—that might indicate that the contract language lacks the required degree of clarity.

*Id.* at ¶ 35 n. 14.

¶ 28 Here, the trial court determined the Note is unambiguous because "[t]he Note clearly and unambiguously states that monthly interest payments are required of the maker" and that "the Note is due and payable in full ... on the 'Due Date.' " Based on this stated conclusion of law, it appears that in making its ambiguity determination, the trial court looked only within the four corners of the written agreement and thus did not consider all relevant credible evidence.

¶ 29 While we recognize that "[w]hether an ambiguity exists in a contract is a question of law," *WebBank v. American Gen. Annuity Serv. Corp.*, 2002 UT 88,¶ 22, 54 P.3d 1139 (quotations and citation omitted), we conclude that where, as here, the trial court erred under *Ward* in failing to base its ambiguity determination on all relevant credible evidence, the proper procedure is to remand. *Cf. Gillmor v. Macey*, 2005 UT App 351,¶¶ 35–37, 121 P.3d 57 (upholding trial court's determination that contract was ambiguous and implicitly indicating that the trial court had properly considered all relevant evidence in making its ambiguity determination), *cert denied*, 126 P.3d 772 (Utah 2005); *Jaramillo v. Providence Wash. Ins. Co.*, 117 N.M. 337, 871 P.2d 1343, 1347 (N.M. 1994) (determining trial court "may have limited its review [of whether an ambiguity existed] to the 'four corners' of the agreement" and stating that "on remand the court may allow extrinsic evidence and reconsider whether an ambiguity exists"). This is because "the credibility ... of the evidence is for the trial court to determine." *Terry's Sales v. Vander Veur*, 618 P.2d 29, 32 (Utah 1980); *see also Kessimakis v. Kessimakis*, 1999 UT App 130,¶ 16, 977 P.2d 1226 ("The trial court is uniquely situated to judge matters bearing on the ... credibility that should be given to evidence."); *Boyle v. Boyle*, 735 P.2d 669, 670 (Utah Ct.App.1987) ("The trial court is clearly in the best posi-

tion to ... determine credibility."). Therefore, we reverse the trial court's grant of summary judgment as to the issue of ambiguity and remand for the trial court to consider all relevant credible evidence and to make sufficient findings as to whether the Note is ambiguous.

## IV. Default Interest Rate

¶ 30 DSI maintains that genuine issues of material fact exist as to whether the default interest rate DSI agreed to under the Note constitutes an unenforceable penalty. Specifically, DSI claims that the default interest rate constitutes liquidated damages so disproportionate to the principal loan amounts as to be unconscionable.[6]

¶ 31 "A party claiming unconscionability bears a heavy burden." *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 402 (Utah 1998). This is because "[w]ith a few exceptions, it is still axiomatic in contract law that 'persons dealing at arm's length are entitled to contract on their own terms without the intervention of the courts for purpose of relieving one side or the other from the effects of a bad bargain.' " *Bekins Bar v. Ranch v. Huth*, 664 P.2d 455, 459 (Utah 1983); *see also Ryan*, 972 P.2d at 402 (explaining the law recognizes the right of people "to freely contract, establishing terms and allocating risks between them"). Courts will not "assume the paternalistic role of declaring that one who has freely bound himself need not perform because the bargain is not favorable." *Bekins*, 664 P.2d at 459. Further, under Utah statute, "parties to a lawful contract may agree upon any rate of interest for the loan or forbearance of any money, goods, or chose in action that is the subject of their contract." Utah Code Ann. § 15–1–1 (2005).

¶ 32 Unconscionability "has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which

6. We need not determine here whether to treat default interest rates in promissory notes as liquidated damages provisions. Courts will not enforce liquidated damages provisions where such provisions are unconscionable. *See Foote v. Taylor*, 635 P.2d 46, 49 (Utah 1981) ("[I]f a provision in a contract provides for liquidated damages which are so grossly excessive in comparison to actual damage suffered that it is unconscionable, the court will not enforce it."); *see also Woodhaven Apts. v. Washington*, 942 P.2d 918, 924–25 (Utah 1997). Thus, regardless of how we treat the interest rate, DSI must demonstrate unconscionability, which it fails to do here.

are unreasonably favorable to the other party." *Ryan,* 972 P.2d at 402 (quotations and citation omitted). Utah courts engage in a two-pronged analysis to determine whether a contract is unconscionable: (1) substantive unconscionability and (2) procedural unconscionability. *See id.* (citing *Sosa v. Paulos,* 924 P.2d 357, 360 (Utah 1996)). While a determination of substantive unconscionability may by itself lead to our concluding the contract was unconscionable, procedural unconscionability alone "rarely render[s] a contract unconscionable." *Id.*

¶ 33 Under the substantive unconscionability prong, we "focus[ ] on the contents of the agreement." *Id.* (quotations and citation omitted). "Even ·if a contract term is unreasonable or more advantageous to one party, the contract, without more, is not unconscionable." *Id.* Instead, the terms must be " 'so one-sided as to oppress or unfairly surprise an innocent party or · · · there exists an overall imbalance in the obligations and rights imposed by the bargain . . . according to the mores and business practices of the time and place.' " *Id.* (second omission in original) (quoting *Sosa,* 924 P.2d at 361).

¶ 34 We conclude the 30% per annum default interest rate agreed to by DSI under the terms of the Note is not substantively unconscionable. In light of DSI's execution of prior notes with previous lending companies, DSI was not an inexperienced party to such agreements, *see Bekins,* 664 P.2d at 462–63 (determining there was no substantive unconscionability and emphasizing that both parties "were experienced business people"), and cannot claim surprise, particularly where the default interest rate under the Note was lower than the interest rates of the two prior notes the Note refinanced. Additionally, because the Note constituted a refinancing of DSI's prior obligations under two earlier promissory notes to a different lender, including unpaid interest and fees, Cantamar assumed more than a minimal amount of risk in refinancing DSI's earlier loans. Even presuming the Note's

default was "high by some standards," the Utah Supreme Court has previously explained that "[a]cquisition of high risk capital almost always requires the payment of a premium," and thus "[i]t is not sound legal policy to establish rules so strict as to unnecessarily dampen legitimate and desirable business activity." *Id.* at 463 (holding that even if lender's interest rates were high by some standards, they were not unconscionable because they were proportionate to the high degree of risk the lender assumed in extending the loans).[7]

¶ 35 Turning to the second prong, procedural unconscionability, we "focus[ ] on the negotiation of the contract and the circumstances of the parties." *Ryan,* 972 P.2d at 403. In considering procedural unconscionability, "[o]ur princip[al] inquiry is whether there was overreaching by a contracting party occupying an unfairly superior bargaining position." *Id.* Factors that we consider in our determination include:

(1) whether each party had a reasonable opportunity to understand the terms and conditions of the agreement; (2) whether there was a lack of opportunity for meaningful negotiation; (3) whether the agreement was printed on a duplicate or boilerplate form drafted solely by the party in the strongest bargaining position; (4) whether the terms of the agreement were explained to the weaker party; (5) whether the aggrieved party had a meaningful choice or instead felt compelled to accept the terms of the agreement; and (6) whether the stronger party employed deceptive practices to obscure key contractual provisions.

*Id.* None of the above factors is dispositive and we consider the factors in light of the unconscionability doctrine's objective of preventing oppression and unfair surprise. *See id.*

¶ 36 Here, other than claiming that DSI "received no legal or financial advice regard-

---

7. Arguably, Cantamar's assumption of risk is even greater in light of DSI's allegations of a purported oral agreement conditioning its repay- ment of the loans on Thuett obtaining an investment.

ing the Note," DSI does not assert, and there is no evidence demonstrating, that DSI did not have a reasonable opportunity to understand the Note or negotiate it if DSI had so desired. Further, the Note was almost identical to prior promissory notes Thuett had prepared for DSI to sign. Finally, there is no indication that DSI suffered from lack of choice, felt compelled to execute the Note, or that Cantamar obscured key provisions of the agreement.

¶ 37 In short, DSI raised no genuine issues of material fact that would demonstrate the default interest rate it agreed to under the Note's terms is procedurally or substantively unconscionable. We therefore hold as a matter of law that the default interest rate does not constitute an unenforceable penalty.

## V.  Mistake

¶ 38 DSI claims that genuine issues of material fact exist as to whether the parties committed a mutual mistake in failing to reference the alleged oral agreement within the Note.[8] Therefore, DSI contends we should remand to the trial court to determine whether the equitable remedy of reformation applies.[9]  " 'A mutual mistake occurs when both parties, at the time of contracting, share a misconception about a basic assumption or vital fact upon which they based their bargain.' " *Warner v. Sirstins*, 838 P.2d 666, 669 (Utah Ct.App.1992) (citation omitted). "In addition, . . . mutual mistake theory may apply to instances where the parties misunderstood the legal effect of the words in a docu-

ment." *West One Trust Co. v. Morrison*, 861 P.2d 1058, 1061 (Utah Ct.App.1993).

¶ 39 Even assuming the alleged oral agreement exists,[10] DSI did not proffer, and the record does not provide, any evidence to demonstrate Cantamar shared DSI's intention that the Note include language referencing the agreement. *Cf. id.* at 1061–62 (concluding the "parties had demonstrated a material issue of fact concerning the existence of mutual mistake" as to whether the parties intended properties to be titled " 'partnership' property or 'joint tenancy' property," because despite defendants' contentions that parties were joint tenants, deposition testimony as to the properties' titles was "inconsistent and contradictory," the parties had filed partnership tax returns, and subsequent written agreements suggested the parties intended to be partners). Because DSI failed to raise any genuine issues of material fact showing that Cantamar had misconceptions about the alleged oral agreement's exclusion or misunderstood the Due Date's legal effect, we refuse to remand on grounds of mutual mistake.

## CONCLUSION

¶ 40 In summary, we affirm in part the trial court's grant of summary judgment, concluding no genuine issues of material fact exist as to whether the Note's default interest rate constitutes an unenforceable penalty and as to whether a mutual mistake occurred. However, we reverse and remand the trial court's determination that the Note

8.  We do not address DSI's claim of unilateral mistake. DSI did not plead unilateral mistake as an affirmative defense. *See* Utah R. Civ. P. 8(c) (requiring parties to set forth all affirmative defenses in pleadings); *id.* 12(h) (deeming as waived almost all "defenses . . . not presented either by motion or by answer or reply"). Nor does DSI contend, or the record indicate, the parties tried the issue of unilateral mistake by express or implied consent. *See Mabey v. Kay Peterson Constr. Co.*, 682 P.2d 287, 289 (Utah 1984) ("It is true that when issues not raised by the pleadings are tried by express or implied consent they shall be treated in all respects as if they had been raised in the pleadings." (citing Utah R. Civ. P. 15(b))). Further, this court generally will not consider issues raised for the first time on appeal. *See Phillips v. JCM Dev. Corp.*,

666 P.2d 876, 884 (Utah 1983) (refusing to address statute of frauds affirmative defense where such defense was not set forth in the pleadings and was raised for the first time on appeal).

9.  To reform the Note for reasons of mutual mistake, DSI "must prove 'that the minds of both parties had been in agreement on a term which they mutually failed to incorporate into the writing.' " *Warner v. Sirstins*, 838 P.2d 666, 669 (Utah Ct.App.1992) (quoting *Ingram v. Forrer*, 563 P.2d 181, 183 (Utah 1977)).

10.  "[P]arol evidence may be admissible to show mutual mistake." *West One Trust Co. v. Morrison*, 861 P.2d 1058, 1061 (Utah Ct.App.1993).

is unambiguous and integrated as a matter of law. We also remand for the trial court to determine whether fraudulent inducement occurred. Consequently, we vacate the trial court's award of attorney fees based on its grant of summary judgment, and remand for proceedings consistent with this opinion.

¶ 41 WE CONCUR: CAROLYN B. McHUGH and WILLIAM A. THORNE JR., Judges.